555 So.2d 713 (1989)
MOTOROLA COMMUNICATIONS AND ELECTRONICS, INC., and Luther A. Jasper
v.
Mrs. Mary WILKERSON, Individually and as Administratrix of the Estate of William Tyler, Deceased.
No. 07-58674.
Supreme Court of Mississippi.
December 20, 1989.
*714 Forrest W. Stringfellow, Daniel Coker Horton & Bell, Trudy D. Fisher, Daniel Coker Horton & Bell, Jackson, for appellant.
John L. Walker, Jr., Walker & Walker, Nausead L. Stewart, Jackson, for appellee.
Before DAN M. LEE, P.J., and PRATHER and ROBERTSON, JJ.
DAN M. LEE, Presiding Justice, for the court:
Appellee (plaintiff below) Mary Wilkerson, daughter of William Tyler, the decedent herein, (hereafter Tyler or the decedent), filed a complaint in her own name against the defendants, Motorola Communications and Electronics, Inc. (hereafter Motorola or Appellants) and its employee, Luther A. Jasper (hereafter Jasper or Appellants) on January 30, 1986, for the wrongful death of Tyler as a result of the February 4, 1980, collision between the vehicle driven by defendant Jasper and Tyler as Tyler attempted to cross Highway 80 on foot. The pleadings alleged that defendant Jasper's negligence caused or contributed to Tyler's death.
During discovery appellee learned of the existence of and secured the transcript of a recorded statement taken by an agent of appellant Motorola, George Murphy, from Tyler, on February 26, 1980 after his discharge from the hospital. The statement was taken at Tyler's home where no one was present except Murphy and Tyler. A *715 notice of intent to introduce portions of said statement into evidence was hand delivered to appellants on May 6, 1987.
The trial in this matter was set for June 8, 1987. On May 29, 1987, ten days prior to the trial, appellee supplemented her interrogatories to name Dr. Hill Williams as as expert who would testify at said trial. Appellants filed a motion on June 4, 1987, to exclude Dr. Williams' testimony. The motion was denied.
The case was tried before judge and jury beginning on June 8, 1987 and a verdict for One Hundred and Fifty Thousand Dollars ($150,000.00) was returned in favor of appellee and judgment entered accordingly. Appellants' Motion For New Trial Or In The Alternative for JNOV, Or In The Alternative For Remittitur was denied. Notice of appeal was duly filed and the following assertions of error assigned:
1. The trial court erred in allowing the testimony of Dr. Hill Williams because (1) appellee did not seasonably supplement her responses to appellants' interrogatories identifying Dr. Hill Williams as an expert witness appellee expected to call at trial and the substance of his opinions; and (2) in the alternative, Dr. Hill Williams did not testify from an area of expertise, and he was not qualified as an expert to render an opinion.
2. The trial court erred by (1) allowing into evidence the transcribed recorded interview of the decedent and by (2) allowing into evidence the irrelevant and prejudicial testimony of several witnesses who were friends of the decedent and allowing into evidence personal photographs of the decedent.
3. The trial court erred in granting Jury Instruction Number P-8(b) which was a misstatement of the law and erroneous.
4. The trial court erred in denying appellants' Motion for a Directed Verdict, Peremptory Instruction and Motion for Judgment Notwithstanding the Verdict.
5. The trial court erred in denying appellants' Motion for a New Trial.
6. The trial court erred in denying appellants' Request for Remittitur.

FACTS OF THE CASE
The date was February 4, 1980. The time of day was approximately 6:00 P.M. or shortly thereafter. The sun had set; it was dark. The weather was clear, but cold. Luther A. Jasper was on his way home after a days' work. He was a zone manager for Motorola and drove about 45,000 to 60,000 miles per year without any prior accidents. Jasper resides in the northern portion of Clinton, Mississippi. On this day he had been to Meridian, MS, to call on some people. He returned to his Jackson office around 4:00 P.M., worked on some paperwork and proceeded home around 5:30 P.M. He normally drove westbound on I-20 to Springridge Road in Clinton, upon which he would continue in a northerly direction, crossing U.S. Highway 80, until arrival at his home. However, on this day Jasper needed to pick up an item at the Jitney Jungle grocery store which necessitated turning right, or in an easterly direction, onto Highway 80 which runs in an east-west direction. The car Jasper was driving was a 1979 four door Chrysler LeBaron sedan owned by Motorola. The car was in excellent condition  the headlights functioned properly and there was no damage to the car.
Jasper testified he was traveling no more than 30 m.p.h. in an area where the posted speed limit was 45 m.p.h. He frequently travelled this portion of Highway 80 and was familiar with the business establishments located near the scene of the accident. At this time Highway 80 was a two-lane highway with a third turning lane in the area of the collision discussed herein. The lights on his car were on low beam. Jasper did not know exactly how far he could see in front of his car, but the headlights on the car were aligned properly and functioned properly.
Meanwhile, William Tyler, an 85-year-old black man dressed in dark colored clothing proceeded on foot to cross Highway 80 *716 from the north side to the south side at a location just to the east of its intersection with Mt. Salus Road, which runs north and south. His destination was the Bread House located on the south side of Highway 80. His purpose was to buy a loaf of bread.
In short, Jasper's car collided with Tyler. It was not a head-on collision. Jasper testified, "... something struck the side of my car." Jasper did not have time to apply the brakes on the car or to blow the horn prior to the impact.
Of course, Tyler was injured. He was taken to the emergency room at Hinds General Hospital where he was examined by Dr. Willford Joel Patterson who had been Tyler's family physician since 1972. Dr. Patterson determined that Tyler had "a contusion or a bruised area and abrasion over the left forehead," ... and that he complained of some pain and had bruises in "multiple areas." He also "had a laceration of the right elbow which was structured." ... He was admitted to the hospital because of his age and his "head trauma." "He ... seemed to do fairly well and was discharged on February the 7th of 1980. He seemed to be doing well."
Approximately a month later, on March 5, 1980, Tyler went to Dr. Patterson's office complaining of having trouble using his left leg and his left arm. Upon examination Dr. Patterson confirmed weakness in Tyler's left arm and leg and became concerned that the condition was caused by the damage to Tyler's head in the collision which had not been evident on the prior hospital stay. He had Tyler readmitted to the hospital. Dr. Michael Vise, a Board Certified Neurosurgeon, was brought into the case. Based on Tyler's medical history and examination, including a computer scan of the brain, he diagnosed Tyler's case as chronic bilateral subdural hematomas. Dr. Vise also testified that "[t]he occurrence of the subdural hematomas, which take a long period of time to develop, in this particular case, based upon a reasonable medical probability was causally related to [the February 4, 1980] accident... ." Dr. Vise operated on Tyler, placing bur holes  these are drainage holes  in the skull to drain off the fluid. The fluid was drained and he improved. Unfortunately, fluid re-accumulated and a second operation was necessary. Tyler remained hospitalized. Dr. Vise testified, "He had made a marginal improvement." Plans were to move Tyler to a nursing home, but before this could be carried out Tyler had a heart attack and died on April 12, 1980, 68 days after the collision.
ISSUE No. 1
The trial court erred in allowing the testimony of Dr. Hill Williams because (1) appellee did not seasonably supplement her responses to appellants' interrogatories identifying Dr. Hill Williams as an expert witness appellee expected to call at trial and the substance of his opinions; and (2) in the alternative, Dr. Hill Williams did not testify from an area of expertise, and he was not qualified as an expert to render an opinion.
(1) Dr. Hill Williams, an assistant professor of Health and Physical Education, testified in rebuttal to the contentions of appellants that Tyler was "running" across Highway 80. One of his teaching assignments at Jackson State University is a course in biomechanics, which at the time of trial he had taught for ten years. "Biomechanics is an area of physical education which is taught at the graduate level which deals with analyzing motion movement; ... to see how efficient ... individuals can move and how ... best [to] move from point A to point B." His training in this area included the study and research in the area of advanced physiology of muscular exercise. Dr. Williams testified that it was his expert opinion that the maximum speed, over a 10 yard distance, an 85 year old person in average health could travel beginning from a stationary position would be 8 to 10 feet per second. His testimony was based upon reliable studies concerning the agility of senior citizens.
Appellants assert the trial court committed reversible error when it allowed Dr. Hill Williams to testify as as "expert witness" for appellee. First, a look at how this conflict arose.
*717 The trial date was set for June 8, 1987. Appellants were under court order requiring appellants to respond to all discovery and requests for admissions directed to them on or before May 26, 1987.
On or about May 7, 1987, Appellants filed a Demand for Supplementation of all interrogatory answers and other discovery directed to Appellee. Thereafter, Appellee filed various supplementations to discovery responses previously filed in response to Appellants' discovery requests. On or about May 29, 1987, three (3) days after the May 26 deadline and ten (10) days before the actual trial date, Appellee filed a Third Supplemental Response to the First Set of Interrogatories Propounded by Appellants. The Supplement was also hand delivered to Appellants on same May 29, 1987. In this Supplemental Answer, Appellee for the first time identified Dr. Hill Williams as an expert witness whom Appellee intended to call at trial, along with a summary of what his testimony would encompass. On June 4, 1987, four (4) days before the scheduled trial, Appellants filed a Motion To Exclude The Testimony Of Dr. Hill Williams which the trial judge denied after hearing oral arguments on June 8, 1987 just prior to the start of the jury trial.
Appellants insist that Dr. Williams' testimony should not have been allowed for three reasons.
First, appellee did not seasonably supplement her interrogatories identifying Dr. Williams as an expert witness she expected to call at trial. Rule 26(f) of the Mississippi Rules of Civil Procedure requires that all interrogatory responses be seasonably supplemented. Appellant claims this is true "particularly where the interrogatory asks for disclosure of expert witnesses." Harris v. General Host Corp., 503 So.2d 795, 797 (Miss. 1986). Furthermore, when interrogatory responses are not seasonably supplemented to identify witnesses, as in the instant case, the trial court should exclude the witnesses' testimony. See e.g., Jones v. Hatchett, 504 So.2d 198 (Miss. 1986), Harris v. General Host Corp., 503 So.2d 795 (Miss. 1986).
In the instant case, Appellants argue that appellee waited until five working days, the "eleventh hour," before identifying Dr. Williams as an expert witness in the area of muscular movement. Applying Rule 26(f), which Appellants remind this court "must be taken seriously," appellants contend that the trial court should have excluded the testimony of Dr. Williams, again citing Harris, supra.
Second, in the alternative, Appellants claim the "expert" testimony should have been excluded because Dr. Williams did not testify from an area of his expertise. Furthermore, the testimony of Dr. Williams was not helpful to the trier of fact.
Third, Dr. Williams was not qualified as an expert witness to render an opinion on muscular movement. Dr. Williams, appellants contend, was not qualified as an expert by his knowledge, skill, experience or training. He had received his doctorate in education. The testimony of Dr. Williams only prejudiced the defendants. See Mississippi Farm Bureau Mut. Ins. Co. v. Garrett, 487 So.2d 1320 (Miss. 1986).
Appellee responds to appellants' arguments in convincing and reasoned fashion. She begins from the premise that this Court has recently impliedly instructed on the critical question of what is a reasonable time by which the identity of an expert witness and a summary of the testimony he/she is expected to give must be divulged to the opposing side prior to the date of the trial. In Brown v. McQuinn, 501 So.2d 1093, 1096-97 (Miss. 1986), the issue was raised by attorneys for appellee in the case at bar. This Court refused to establish a specific time period before the trial for such discovery to be complete, instead opting to refer this matter for study to the Supreme Court Advisory Committee on Rules in the State of Mississippi. Id. at 1097. By doing so, this Court left intact its prior ruling that such discovery deadline must be a reasonable time before trial. See Ladner v. Ladner, 436 So.2d 1366 (Miss. 1983), construing Miss. Code Ann. § 13-1-226(b)(4)(A), which statute merely requires that experts be named "seasonably" before trial.
*718 So, the pertinent question to be answered is: Was ten (10) days prior to the trial soon enough for plaintiff to inform appellants of Dr. Hill Williams' testimony? The trial court responded in the affirmative reasoning that
[I]n light of the fact that this testimony is on a very narrow issue and that the expert lives here in Jackson and is available and the issue appears to be one to which a number of persons would be qualified to give testimony, the Court will find that the interrogatories were seasonably  the answers to interrogatories were seasonably supplemented for this purpose.
Appellee refutes appellants' claim that appellants were notified of Dr. Williams' planned testimony, in actuality, "five business days" before the trial. Appellee responds, "And, as this court well knows, Saturdays and Sundays are working days as far as lawyers are concerned and Judges also." We would agree with this statement but would emphasize that its importance is misleading. That is, it's a matter of "how much" must be accomplished in whatever limited time is available to the short-noticed party prior to trial. For example, if the expert witness plans to testify on complex matters or on an issue that may be the turning factor in a case, then it is important that the necessary time be allotted prior to trial to depose said expert, transcribe the deposition, meticulously study the testimony and, if necessary, solicit a rebuttal expert witness to refute the former expert's planned testimony. If this be the case, additional time will be needed to prepare same rebuttal expert witness.
Therefore, it is not so much a matter that lawyers and judges often work on Saturdays, Sundays and holidays (particularly just prior to a trial) but that a sufficient amount of time is allotted before trial to completely deal with the scope of the planned testimony of an "eleventh hour" expert witness. In the case at bar, the learned trial judge made this distinction and concluded as stated above that the issue upon which Williams was to testify was narrow and impliedly could be quickly and easily dealt with within the ten days preceding the trial date. Using this line of reasoning, appellee stresses another reason to uphold this ruling which in short is: appellants failed to demonstrate why this should be an issue in the first place.
The [appellants] did not inform the court of any specific reasons as to why ten days prior to trial was not reasonable. They proffered no efforts that had been made or any that they tried to make to secure Dr. Williams' deposition and/or counter expert if they thought that to be necessary. Nor did [appellants] request a continuance or delay in beginning the trial to either depose Dr. Williams or secure a counter expert.
We find no merit to subpart (1) of this first assignment of error.
(2) Appellants suggest an alternative reason for disallowing Dr. Williams' testimony on the basis that "his testimony was incompetent expert testimony. Dr. Hill Williams, who has his doctorate in education, was called as an expert witness in muscular movement."
We are persuaded by appellee's cited authorities relative to whether Dr. Williams was a qualified expert as to the limited matters about which he testified; that is, the speed at which an 85 year old person can move from point A to point B within a given time span. This court has ruled that:
We have held in numerous cases that formal education is not the only means of becoming an expert in a field. "A witness may qualify to give an expert opinion through his experience." Cain v. Mid South Pump Co., 458 So.2d 1048, 1050 (Miss. 1984). See also, Merritt v. Dueitt, 455 So.2d 792 (Miss. 1984); Early Gary, Inc. v. Walters, 294 So.2d 181 (Miss. 1974). But the trial judge must determine:
Whether the proffered witness has obtained the required degree of specialized knowledge within a particular field ... and unless there is an abuse of that discretion, his determination will not be disturbed on appeal. *719 City of Mound Bayou v. Roy Collins Construction Co., 499 So.2d 1354, 1360 (Miss. 1986).
In the case at bar, appellants had ample opportunity to voir dire Dr. Williams after appellee tendered him as an expert. The questioning was conducted in the presence of the jury and so each juror was in a position to determine individually the impact of Dr. Williams' testimony. Frankly, we think from reviewing the record that Appellants' attorney conducted an excellent voir dire of Dr. Williams, exploring his educational background and thus giving the jury some ponderable points to weigh and balance before tendering the witness back to appellee in order to conduct her direct examination of Dr. Williams. We find no merit to subpart (2) of this first assignment of error.
ISSUE No. 2
The trial court erred by (1) allowing into evidence the transcribed recorded interview of the decedent and by (2) allowing into evidence the irrelevant and prejudicial testimony of several witnesses who were friends of the decedent and allowing into evidence personal photographs of the decedent.
(1) Again, the accident took place on February 4, 1980. Tyler was hospitalized and discharged on February 7, 1980. Tyler was hospitalized a second time on March 5, 1980. During this interim period he remained at his home. On February 26, 1980, an investigator for the appellants' insurance carrier, George Murphy, took a recorded interview of Tyler. The interview was later transcribed. Prior to trial appellee notified appellants of her intention to introduce Tyler's statement into evidence. Of course, Tyler had expired by this point in time. Over the objection of appellants, the trial court allowed Murphy to read the statement to the jury. The trial judge ruled that the statement was admissible hearsay pursuant to Rules 803(24) and 804(b)(5) of the Mississippi Rules of Evidence.
The trial judge reasoned as follows:
In order to determine that this statement is admissible, the Court must determine whether or not the statement is offered as evidence of a material fact or if it's more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts and whether the general purposes of these rules and the interest of justice would be best served. The Court must further find that notice of an intent to use the statement has been given, which the Court does find. The statement in question is the Plaintiff decedent's version of how in question is the Plaintiff decedent's version of how the accident happened and the Court finds that it is offered as evidence of material fact and the statement offered is the only statement of the decedent's version of what happened at the time of this accident. The only other evidence of which the Court is aware of and eye witness is the testimony of one of the Defendants, the driver of the automobile.
Under the circumstances of this case as distinguished from the Land case,[1] the statement was given to the agents of the adverse party here. In the Land case under similar circumstances, the statement was given to the representative of the Workman's Comp carrier who had the same interest as the Plaintiff in the litigation in question. Here the statement was given to an adverse party and it was given at a time when the only persons present were the adverse party's agent and the person giving the statement. And despite the fact that the statement is in most instances, although not all, self-serving, it was given under circumstances which the Court concludes tended to show trustworthiness. Because of the fact that it is the only available evidence of the Plaintiff decedent's version of how the accident happened, the Court concludes that it is in the interest of justice and to serve the purpose of these rules to allow the statement.
*720 We agree with the learned trial judge and hold that the statement meets all of the requirements of Miss.R.Evid.P. 804(b)(5).
Miss.R.Evid. 804(b) exempts from exclusion as hearsay statements of declarants who are unavailable as a witness and Miss. R.Evid. 804(a) defines a deceased person as an "unavailable declarant."
Miss.R.Evid. 804(b)(5) reads:
A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under the exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.
We would call attention to the bench and bar our instructive analysis on this very issue in Cummins v. Mississippi, 515 So.2d 869 (Miss. 1987), a case handed down by this Court after the case at bar was decided by the trial court. In Cummins, we held that the hearsay statement in dispute did not comply with the five-part test set forth therein, but here we reach the opposite result.
For matters of convenience and emphasis, we repeat the five-part test:
(1) The proponent of the evidence must give the adverse party the notice specified within the rule.
(2) The statement must have circumstantial guarantees of trustworthiness equivalent to the 23 specified exceptions listed in Rule 803.
(3) The statement must be offered as evidence of a material fact.
(4) The statement must be more probative on the point for which it is offered than any other evidence the proponent can procure through reasonable efforts.
(5) The general purposes of the Federal Rules and the interests of justice must best be served by admission of the statement into evidence.
Even without the benefit of the above instructive language from Cummins (because it had not been decided by this Court at the time), the trial judge analyzed the issue in an almost identical process. We hold the statement of decedent who was unavailable as a witness was admissible.
(2) Over the objection of the appellants, the trial judge allowed the following photographs to be introduced into evidence:
Exhibits 9 and 10: Decedent and his two grandsons attending the graduation ceremony of decedent's daughter when she received her Masters Degree; taken around 1974-1976
Exhibit 11: Decedent and two grandsons attending wedding
Exhibit 12: Decedent in hospital before surgery
Exhibit 13 and 14: Decedent in hospital after surgery
Exhibit 15: Pew where decedent always sat in church draped in black and flowers for his funeral
Exhibit 17 and 18: Cornerstone of Pleasant Green Missionary Baptist Church naming decedent as a deacon
Exhibit 19: Pastor, Pastor's daughter, decedent, and decedent's daughter at a Father's Day event held at the church, 1977
Exhibit 20: Decedent being awarded as a senior officer for outstanding services to the church
Exhibit 21: Pastor, Pastor's wife and decedent
Exhibit 23: Pastor, decedent and two other deacons, 1978
Exhibit 24: Decedent and his friend, Mr. Tobias, 1978

*721 Exhibit 26: Decedent playing his guitar, 1970s
Exhibit 27: Decedent and friends at Thanksgiving dinner
Appellants claim "that [t]he plaintiff offered this personal photo album of the decedent for the sole purpose of eliciting sympathy from the jury. Such a ploy should not be upheld by the Supreme Court."
Defendants do not argue that any pictures introduced into evidence in this case are prejudicial per se. Defendants do not argue that the plaintiff was only entitled to offer a specific number of pictures into evidence, but there must be a point at which the cumulative effect of numerous photographs prejudice the defendants. This is especially true when one of the photographs shows the decedent's pew in his church draped in black and flowers. If the admission of this particular photograph is upheld, what will be next? Pictures of the family grieving at grave side? Photographs of the decedent and his friends are irrelevant to the plaintiff's case and were prejudicial and cumulative.
On the issue of admissibility of photographs, it is within the sound discretion of the trial judge whether to admit photographs into evidence. Jesco, Inc. v. Shannon, 451 So.2d 694 (Miss. 1984). Furthermore, while judges are given wide latitude in performing this discretionary function, they are cautioned to review evidence to determine its probative value against its prejudicial effects upon a jury. Trapp v. Cayson, 471 So.2d 375 (Miss. 1985).
Appellee contends that these pictures were directly relevant to the issue of damages. We agree.
In sum, appellee asserts that the pictures showing the deceased well, healthy and interacting with family shortly before his death was the most probative evidence that the plaintiff could produce showing the actual physical condition of the deceased, thereby giving the jury some idea of what his life expectancy was likely to be, more or less than the normal range, and just what was to be the quality of his life during that time span. As regards the picture of the deceased's church pew draped in black, appellee hypothesizes "[a]ll that this could conjure up in the minds of the jury was that Tyler was dead and was held in high esteem by his fellow church members. But, then the jury already knew Tyler was deceased. That is what this case is all about after all."
In addition, appellants contend that the testimony of Reverend J.D. Broome, Mrs. Holly Broome and Larry Tobias was cumulative, irrelevant and prejudicial. Each witness testified to facts already testified to by the plaintiff and her son. Appellants argue that the sole purpose of their testimony was to elicit sympathy and passion from the jury.
In response, appellee contends "[e]ach of these witnesses gave testimony which allowed the Jury to determine the state of Tyler's physical condition prior to his death... . Moreover, there is no rule of evidence which states that evidence may not be cumulative. The crux of the matter, though, is that this was testimonial evidence necessary to the determination of damages."

ANALYSIS
We agree with the lower court judge in allowing into evidence the so-called "personal photo album" of the decedent. These pictures were directly relevant to the issue of damages. This is not a case of photographs which are gruesome or inflammatory and lack an evidentiary purpose thus making them inadmissible as evidence. McNeal v. State, 551 So.2d 151 (Miss. 1989); Cabello v. State, 471 So.2d 332, 341 (Miss. 1985); Billiot v. State, 454 So.2d 445, 449-60 (Miss. 1984).
Instead, it is a wrongful death case in which an 85-year-old man by every indication appeared healthy and well prior to being hit by a car on February 4, 1980. Not being available to testify at trial, it was critical to plaintiff's case to humanize decedent and demonstrate to the jury that decedent was well and healthy prior to the accident. This, the so-called "personal photo album" accomplished.
*722 Arguably, there are a couple of photographs that may ride the line of prejudicial effect, i.e., picture of the deceased's church pew draped on the day of his funeral and the pictures of the cornerstone at Pleasant Green Mississippi Baptist Church naming the decedent as a deacon. However, when these photographs are viewed singularly or as a whole, we are not struck by a sense of prejudice or emotional upheaval, nor can we surmise how a reasonable juror could otherwise be affected when viewing said photographs. Therefore, even for the sake of argument, if one can conjure a prejudicial effect from the photographs, the prejudice is slight and does not rise to the level of reversible error.
Finally, in regard to the testimony of J.D. Broome, Mrs. Holly Broome and Larry Tobias, we agree with appellee that the testimony was essential to determine the state of Tyler's physical condition prior to his death. It is true that some of the testimony given by plaintiff and her son was duplicated by the testimony of the three witnesses in question. However, it should be noted that appellee and her son had much to gain by their testimony and appellee stood on more solid ground in the eyes of the jury if that testimony could be verified and corroborated. This was accomplished with the testimony of the three above mentioned witnesses who, unlike plaintiff and her son, had no financial stake in this matter.
Appellants' arguments fail on issues 2.(1) and (2).

ISSUE No. 3

THE TRIAL COURT ERRED IN GRANTING JURY INSTRUCTION NUMBER P-8(b) WHICH WAS A MISSTATEMENT OF THE LAW AND ERRONEOUS.
Jury instruction NO. P-8 is confusing. It combines testimony and statutory language in such a way that it seems to be a comment on the evidence and is doubtful that the instruction was helpful to the jury; therefore, it should not have been given. The bench and bar would be best advised not to grant such an instruction in the future. However, in this case the trial judge ruled on 54 instructions. Appellee submitted a total of 27 instructions in which 17 were granted, and ten were refused. Appellants also submitted a total of 27 instructions of which 16 were granted, and 11 were refused. In sum, 33 of the 54 instructions were granted. The fact that the jury was responsible for sorting through and calling to mind 33 instructions prior to rendering a verdict makes it highly unlikely that the one instruction by itself will be confusing to the point of misleading them so seriously as to necessitate reversal. This is not to say that this is not possible  in effect that is what appellants argue here today  but it does lead us to believe that the instruction must be grossly incorrect and confusing to have the effect appellants pray for today.
The trial court's Instruction No. 1 is helpful. There the judge makes it very clear how the jury is to handle this voluminous amount of instructions: "You are not to single out one instruction alone as stating the law, but you must consider these instructions as a whole."
We hold that whatever misleading effect or misstatement of the law derived from Jury Instruction No. P-8 was evenly offset with the admittance of Instruction Nos. 10(D-24) and 25(D-16[A]) and does not warrant reversal.
Appellants' argument fails on Issue No. 3.

ISSUE No. 4

THE TRIAL COURT ERRED IN DENYING APPELLANTS' MOTION FOR A DIRECTED VERDICT, PEREMPTORY INSTRUCTION AND MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT.
We conclude that there was evidence of a question of negligence put before the jury at the time appellants moved the court for a directed verdict. Whether the collision was caused by the negligence of the decedent or the negligence of appellant, Jasper (who was driving the car that hit decedent), is a factual toss-up to be determined by the jury. Therefore, appellants' *723 request for reversal on this point is denied.
Furthermore, a review of the entire record and briefs by both parties reveals substantial evidence in the record to support the verdict. Thus, the test being the same for a motion for peremptory instruction and motion for j.n.o.v., this case passes such test and appellants' argument is denied.

ISSUE No. 5

THE TRIAL COURT ERRED IN DENYING APPELLANTS' MOTION FOR A NEW TRIAL.
The general rule in Mississippi is that the trial court has the power and duty to set aside a verdict and order a new trial whenever, in its sound judgment, such action is required. See Rule 59(a)(1), Miss.R. Civ.P.
It is the province of the jury to determine the weight and worth of testimony and credibility of the witness at trial. Burnham v. Tabb, 508 So.2d 1072, 1077 (Miss. 1987), and this Court will assume that the jury at trial drew every permissible inference from all the evidence. Id. Accord, Phillips v. Dow Chemical Co., 151 So.2d 199, 201 (Miss. 1963). More specifically, in response to the Phillips appellants' contention that the verdict therein was contrary to the overwhelming weight of the evidence and was the result of bias, passion and prejudice, the Phillips Court noted:
In resolving this question we are mindful of our duty to set aside a verdict whenever we can confidently say that the jury did not respond to reason and therefore acted from motives of bias, passion and prejudice. In so doing, the rule is that we must view the evidence in the light most favorable to the party in whose favor the jury decided. Moreover, we are not permitted to consider isolated parts of the evidence apart from the whole, and we must assume that the jury drew every permissible inference in favor of the successful party.
Id.
In the case at bar, we find the trial judge acted correctly and within his discretion to deny appellants' motion for a new trial, primarily because the record contained sufficient evidence supporting the judgment awarded plaintiff.

ISSUE No. 6

THE TRIAL COURT ERRED IN DENYING APPELLANTS' REQUEST FOR REMITTITUR.
First, it should be noted that in her closing argument, appellee requested that the jury award a verdict to appellee in the amount of $480,625.73. This requested amount was broken down in her closing argument, as follows:

Pain & Suffering of Decedent:
 1st 3 days in hospital $200/day $ 600.00
 Last 65 days 24,000.00
Decedent's Mental Anguish
during Last 68 Days 33,100.00
Loss of Society and Companionship
 (Based on life tables; 7.3 years
 remaining for 85-year-old Black
 man) 43,800.00
Medical Bills 12,063.00
Unexplained $367,062.73
 ___________
 TOTAL $480,625.73

The standard of review for damages is set forth in Miss. Code Ann. § 11-1-55 (1972) as follows:
The Supreme Court or any other court of record in a case in which money damages were awarded may overrule a motion for a new trial or affirm on direct or cross-appeal, upon condition of an additur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded are contrary to the overwhelming weight of credible evidence... .
Appellee persuasively demonstrates that the damages awarded were not just for the wrongful death of Tyler because decedent suffered severe pain, suffering and mental anguish from February 4, 1980, to April 12, 1980, as a result of the injuries he sustained in the February 4, 1980, collision. This fact is evident from the testimony of Dr. Michael Vise:
Q: And what was that treatment, Doctor?

*724 A: The treatment was to place bur holes  these are drainage holes  in the skull to drain this fluid off. We did not initially. We drained fluid, and he improved. He subsequently re-accumulated his fluid because that is one of the  it is part of the pathological process in this disease. Once you get the old membranes in an elderly person, it's sometimes extremely difficult to get the fluid to no longer re-accumulate. He re-accumulated fluid. We had to drain them again. We put drains over the surface of the brain and had a bag of externally drain fluid for several days thereafter. We eventually took the drain out. He seemed to be improving, and then prior to transfer to a nursing home, he had a cardiac arrest. His heart stopped beating.
Q: Now, Doctor, let me ask you this. You said that you did bur holes. Where were the bur holes? Well, first of all, what are bur holes?
A: A bur hole is simply a hole about the size of a dime that is drilled into the skull, usually in these locations, or they can be at the front... .
Dr. Vise further testified that during his final hospital stay, Tyler was agitated and restless, had symptoms of the "irritation to his brain from the blood clots over the surface of the brain,..." for which pain and suffering he was given Thorazine, a tranquilizer. Tyler, also during this period, suffered from signultus (hiccups) for two reasons: (1) the irritation to his brain, and (2) from a specific medication he was taking, cortisone. Finally, Dr. Vise testified that because of Tyler's "General state of debilitation, being weak, having ... blood clots over the brain, ... the irritation [and] the entire illness ..." caused Tyler to experience nausea, and caused problems with poor appetite and vomiting. There is testimony of Nurse Adams about Tyler being required to use a foley catheter and drainage bag, feeding tube forced down his throat and posey jacket to restrain his movement. Further, there is an abundance of testimony from the plaintiff, Glenn Wilkerson, Rev. Broome, Mrs. Broome, and Mr. Tobias.
With regard to the loss of society and companionship, it is noted that according to life tables in effect at the time of decedent's death, he had at least 7.3 years of life remaining. Appellee was decedent's only child. They were extremely close and the evidence showed they communicated daily, either personally or by telephone. Decedent was accustomed to performing odds and end jobs for his daughter on a fairly regular basis.
Where, at first blush, a jury verdict in the amount of $150,000 for the wrongful death of an 85-year-old man may appear on the high side, we have examined the entire record thoroughly and hold that this amount comports with the evidence and with the prior health, the severe pain, suffering and mental anguish the decedent experienced, appellee's (an only child) loss of society and companionship and the medical expenses.
We give great deference to the jury and conclude that our consciences are not shocked by this amount.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and PITTMAN, JJ., concur.
BLASS, J., dissents by separate written opinion.
BLASS, Justice, dissenting:
I am unable to concur with the majority in this case. I have read the record carefully and find no evidence of any negligence whatsoever on the part of the appellant, defendant below. There is no evidence of improper equipment nor is there evidence of any negligence in the operation of the automobile. The plaintiff's decedent walked or ran into the side of the appellant's automobile and suffered the injuries which eventually caused his death. There was no way the driver of the automobile could avoid the accident. It was a tragedy. The record shows that Mr. Tyler was a good man, loved and respected in his community, *725 but, for some reason, he crossed one side of the highway and walked or ran into the side of an automobile in the opposite lane. We do not know why the accident happened, but we do know how. The record does not, in my judgment, show that the appellant was negligent in any way.
I would reverse and render.
NOTES
[1] Referring to Land v. American Mutual Ins. Co., 582 F. Supp. 1484 (E.D.Mich. 1984.)