659 So.2d 877 (1995)
A.J. MOODY
v.
RPM PIZZA, INC., d/b/a Dominoes Pizza and Stennis Butler, Individually and as Employee, Agent and Servant of Dominoes Pizza.
No. 92-CA-00328-SCT.
Supreme Court of Mississippi.
August 3, 1995.
*878 John L. Hunter, Cumbest Cumbest Hunter & McCormick, Pascagoula; Donald P. Sigalas; J. Brice Kerr, Pascagoula, for appellant.
William E. Whitfield, III, Bryant Clark Dukes Blakeslee Ramsay & Hammond, Gulfport, for appellee.
Before HAWKINS, C.J., and SULLIVAN and McRAE, JJ.
SULLIVAN, Justice, for the Court:
Alfred J. Moody filed a complaint against Dominoes Pizza and Stennis Butler, individually and as employee, agent and servant of Dominoes, on January 23, 1990, alleging that while driving his automobile on May 5, 1989, he was rear-ended by a vehicle driven by Butler. Moody claimed damages in the form of physical pain, mental anguish and loss of wage earning capacity. Dominoes filed a response admitting that it was vicariously liable for any of Butler's negligent acts involved in the accident at issue. The trial commenced on January 14, 1992, and the jury returned a verdict on January 17, 1992, awarding Moody $17,740.74 in damages. The court entered judgment on the verdict on January 23, 1992.
The defendants filed a motion for a judgment notwithstanding the verdict on January 29, 1992, claiming that the verdict of the jury was contrary to the overwhelming weight of the evidence on the issue of liability. Moody filed a motion for a new trial as to damages only, or in the alternative, for an additur. The court denied the motions filed by both sides on March 16, 1992. Moody presents the following assignments of error on appeal:
I. WHETHER THE VERDICT OF THE JURY WAS CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE?
II. WHETHER THE VERDICT OF THE JURY EVINCES BIAS, PASSION AND PREJUDICE AGAINST THE PLAINTIFF AND REPRESENTED ONLY AN AWARD FOR MEDICAL EXPENSES IN TOTAL DISREGARD OF THE INSTRUCTIONS OF THE COURT REGARDING DAMAGES THAT SHOULD BE AWARDED IN THIS CASE, AND PARTICULARLY IN VIEW OF THE LACK OF ANY EVIDENCE OF CONTRIBUTORY NEGLIGENCE?
III. WHETHER THE COURT ERRED IN ALLOWING HEARSAY TESTIMONY BY DR. FINEBURG REGARDING STATEMENTS BY HIS EMPLOYEES?
IV. WHETHER THE COURT ERRED IN FAILING TO SUBMIT TO THE JURY THE $553.05 MEDICAL BILL FROM SINGING RIVER HOSPITAL SINCE IT WAS SUFFICIENTLY AUTHENTICATED AND SHOWN TO BE REASONABLY RELATED TO TREATMENT OF PLAINTIFF'S INJURIES?
Dominoes and Butler present the following assignment on cross-appeal:
V. WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT?

THE FACTS
This lawsuit stems from an automobile accident in which Moody was allegedly injured when an automobile driven by Butler rear-ended Moody's car while stopped at an intersection in Moss Point, Mississippi. At the time of the accident, Butler was operating his vehicle in the course and scope of his duties as an agent and employee of Dominoes Pizza.
*879 Pat Hinkle was several cars behind Moody when Butler rear-ended Moody. Hinkle testified on cross-examination that the accident did not appear to be too severe, and that Moody only complained that he was shaken up after the accident. Moody did, however, get out of his car clenching his neck. Hinkle testified that he and a few other individuals operated Moody's shrimp boat after the accident since Moody was in pain and unable to do so himself. He testified that any records of their business together were destroyed when the boat on which they were stored sank.
Leonard Click, a commercial fisherman, had been close friends with Moody for the majority of the last ten years. Prior to the time of the accident, he saw Moody perform the physically demanding tasks required for shrimping on numerous occasions. However, he responded to a radio call on June 6, 1989, the opening day of shrimp season, and found Moody lying on the deck of his boat (the "Agnes Marie") rubbing his neck and "scratching his hand or something." Click helped Moody run his boat during the remaining portion of the afternoon because of his severe pain. The next day, they went out again only to return to shore because of Moody's pain. Click said Moody did not take his boat out again until December of 1989. Click testified that Moody is now in the live bait business because it was less physically demanding than commercial shrimping.
On June 19, 1989, Moody complained to a chiropractor, Dr. Drake, about pain in the right side of his lower neck, pain in his right arm and numbness in his right hand. Moody told Dr. Drake that his symptoms began the day after the May 5, 1989, car accident, and that he had been in no other accidents. Dr. Drake's examination basically confirmed Moody's complaints. His diagnosis was subluxation, abnormal movement of vertebra, at the C5-C6-C7 area with possible disk involvement. He also stated that Moody suffered a 30-40% reduction of motion in his neck area. He advised Moody to see a medical doctor because of the severe pain and numbness in his right hand.
Moody also went to the emergency room, on June 19, 1989, and either he or his wife related the following history to the hospital staff:
Thirty-one (31) year old white male complains of pain in right shoulder, shoulder blades, radiating to right arm and into back. Pain started two days ago out on a shrimp boat. Pain continuous, Nuprin and Bengay, pre-hospital treatment, no relief, denies injury or trauma.
In the same document, there was a box next to the words "place of accident" which had not been marked. Also, the word "none" was indicated in the box next to "Accident." On another medical document, filled out June 24, 1989, there was nothing marked in the box next to "place of accident," and "no" was indicated next to "accident." Moody also indicated that he had suffered a history of falls. In a form filled out June 27, 1989, three days after Moody was admitted to the hospital on an out-patient basis, the history reads that the patient "had an accident at work and M.V.A." Moody claimed at trial that he never had an accident at work. Interestingly, on Moody's discharge notice from the hospital, dated June 28, 1989, the "place of accident" says Main Street in Moss Point. Again, Moody did not know whether he or his wife filled out the forms introduced at trial.
Dr. Fineburg, a family practitioner, examined Moody on June 20, 1989. Dr. Fineburg testified by deposition that he treated the patient for muscle spasms by administering local creams. There was also an indication in his records that Moody came to the office on August 3, 1989 and directed the office manager to mark on his medical records that his injuries had not been caused by a fall, but by a motor vehicle accident.
On July 5, 1989, Moody visited a neurosurgeon by the name of Dr. McCloskey. His deposition was admitted in evidence, and it documented Moody's medical history as follows:
My records indicate that this thirty-one year old commercial fisherman reported that he was injured in an automobile accident on May 5th, 1989. At first he didn't think there was any serious problem. His neck, though, was stove up, but within a few days the problem began to worsen *880 instead of getting better. He developed more neck pain, stiffness, and shoulder pain, and gradually evolved a syndrome of severe pain and aching, radiating down the right arm. In the three weeks prior to my seeing him on July the 7th he had developed an electric like current radiating down his right arm, primarily to the index, but also the middle finger. He was hospitalized by Dr. Millette. Myelogram showed a large disk herniation at C6-7 on the right side.
Dr. McCloskey performed surgery on the back of Moody's neck and removed the herniated disk. Dr. McCloskey testified that it was very common for someone to mistakenly think they were not seriously injured only later to be diagnosed with a herniated disk. He further believed Moody's injuries were permanent, and that they were consistent with the type of automobile accident that occurred. Moody is now unable to perform overhead work, and he is limited to lifting 20 pounds occasionally and 10 pounds on a regular basis.
Mrs. Moody testified that her husband's condition steadily worsened from the day he came home holding his neck on May 5, 1989. She said that he did not go back to work after his surgery for nearly one and one-half years. She said his actions were still very limited. After the accident, their "intimate relationship" was non-existent. At the time of trial she said that their "intimate relationship" had improved, but that it was not as good as it had been before the accident.
Moody testified that he was in good health until this accident. After he was released from the hospital following surgery, he disobeyed Dr. McCloskey's orders by going to the boat dock where he removed his brace, boarded his boat, and reinjured himself by attempting to bend over and pick up a wrench. This incident landed him back in the hospital for two or three days.
Moody testified that he had to switch to the live bait business because it was less physically demanding than commercial shrimping. He complained that he was confined to driving the boat while the deck-hand did the physically demanding work. He offered some rather inconsistent testimony regarding his earnings in the live bait business. He claimed he was earning less than in the shrimping business, however, he stated that he really would not know until he filed his taxes, and that "[b]y the time you compare a three or four hundred dollar check every week and this here, then probably now I'm making more money in the bait business." Moody stated that his medical bills totaled $18,466.54, but the trial judge sustained a defense objection to the admission of a $553.05 portion of that amount.
David Gregory was acquainted with Moody through the shrimping business. He explained that the Agnes Marie was a commercial boat, but that at the time of trial, Moody used it as a live bait boat. Gregory stated that he saw Moody shrimping frequently in 1989, and that in 1990, Moody was still shrimping commercially. Gregory stated that Moody was a liar, although he admitted that Moody and he were angry at each other. Gregory also stated that Moody illegally shrimped all night long, from dark to daylight, in the year 1990.

I.

WHETHER THE VERDICT OF THE JURY WAS CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE?

II.

WHETHER THE VERDICT OF THE JURY EVINCES BIAS, PASSION AND PREJUDICE AGAINST THE PLAINTIFF AND REPRESENTED ONLY AN AWARD FOR MEDICAL EXPENSES IN TOTAL DISREGARD OF THE INSTRUCTIONS OF THE COURT REGARDING DAMAGES THAT SHOULD BE AWARDED IN THIS CASE, AND PARTICULARLY IN VIEW OF THE LACK OF ANY EVIDENCE OF CONTRIBUTORY NEGLIGENCE?

Because these two assignments are essentially two similar standards under one issue, they will be treated as one assignment for purposes of this opinion. Green v. Grant, 641 So.2d 1203, 1208 (Miss. 1994) (citing *881 Odom v. Roberts, 606 So.2d 114, 119-20 n. 5 (Miss. 1992)).
Moody argues that he is entitled to an additur, or in the alternative, a new trial on the issue of damages, because the jury failed to consider pain and suffering, permanent disability and lost income. He contends that its failure to consider these categories of damages was evidenced by the award of damages equaling the exact amount of his medical bills. The defendants argue on cross-appeal that the evidence did not justify a finding of liability for Moody's injuries and that they were therefore entitled to a j.n.o.v. In the alternative, the defendants argue that the jury verdict is supported by the disputed facts and should stand.
Our law is well settled on the issue of a trial court's ruling on a motion for a new trial.
The grant or denial of a motion for a new trial is and always has been a matter within the sound discretion of the trial judge. The credible evidence must be viewed in the light most favorable to the non-moving party. The credible evidence supporting the claims or defenses of the non-moving party should generally be taken as true. When the evidence is so viewed, the motion should be granted only when upon a review of the entire record the trial judge is left with a firm and definite conviction that the verdict, if allowed to stand, would work a miscarriage of justice. Our authority to reverse is limited to those cases wherein the trial judge has abused his discretion.
Green, 641 So.2d at 1207-08 (citing Anchor Coatings, Inc. v. Marine Indus. Residential Insulation, 490 So.2d 1210, 1215 (Miss. 1986)); see also Motorola Communications & Elecs. v. Wilkerson, 555 So.2d 713, 723 (Miss. 1989).
Miss. Code Ann. § 11-1-55 (1991) provides the following authority for this Court to order an additur:
The supreme court or any other court of record in a case in which money damages were awarded may overrule a motion for new trial or affirm on direct or cross appeal, upon condition of an additur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence. If such additur or remittitur be not accepted then the court may direct a new trial on damages only. If the additur or remittitur is accepted and the other party perfects a direct appeal, then the party accepting the additur or remittitur shall have the right to cross appeal for the purpose of reversing the action of the court in regard to the additur or remittitur.
This Court held in Rodgers v. Pascagoula Public School District, 611 So.2d 942, 945-46 (Miss. 1992), that the plaintiff was entitled to an additur where the jury awarded the plaintiff the exact amount of his medical expenses, $11,762.50, and the plaintiff had put on proof that his damages included not only medical expenses but also some pain and suffering. Id. at 945-46.
This Court held that the trial court did not err in refusing to grant an additur, or a new trial, to the plaintiff where the jury awarded damages in the amount of $5,600.00 after the plaintiff testified that her total medical bills amounted to $11,560. Brake v. Speed, 605 So.2d 28, 31, 34 (Miss. 1992). The Court found the jury's verdict defensible on the record because the plaintiff had been involved in a subsequent car accident involving more extensive medical treatment than the accident caused by the defendant. Id. at 35. Moreover, the plaintiff's chiropractor indicated that her condition had generally improved prior to the second accident. Id. It was also noted that the plaintiff failed to produce documentation verifying employment or rate of pay. Id. at 34-35.
The plaintiff was also denied an additur in Leach v. Leach, 597 So.2d 1295 (Miss. 1992), where the jury awarded the plaintiff $2,000 after the plaintiff produced evidence that the he sustained injuries and incurred $2085.90 in medical bills after the defendant hit him with a board. Id. at 1296. The defendant produced evidence that he struck the plaintiff in self-defense, and that the plaintiff left the medical center against doctor's orders when *882 he regained consciousness. This Court determined that the jury was permitted to assess the plaintiff's contributory negligence in reducing its award to the plaintiff. Id. at 1298. To hold otherwise, "would be tantamount to holding that a jury is to be instructed that they must return a verdict for all alleged damages. This should not be the law." Id. at 1299.
This Court very recently upheld a trial court's denial of a request for an additur, or new trial on damages. Green v. Grant, 641 So.2d 1203 (Miss. 1994). The majority opinion was based on the determination that "the extent of Green's injuries, the reasonableness and necessity of her medical expenses, and the reasonableness and necessity of her lost income were seriously contested." Id. at 1209.
In this case, the court admitted into evidence medical bills in the amount of $17,913.49. However, an obviously unrelated $172.75 bill was inadvertently admitted into evidence, being a bill of a family member Ashley N. Moody. The jury awarded Moody $17,740.74  the amount of the medical bills in evidence less the inadvertently admitted bill. Thus Moody was awarded damages in the exact amount of his medical bills. Jury instruction P-10, which was given to the jury, reads as follows:
The Court instructs the Jury that if you find your verdict for the Plaintiff, Alfred J. Moody, that in considering the amount of damages which the Plaintiff may have sustained, you should weigh and consider evidence as to the following items, which if supported by a preponderance of the evidence, are proper subjects for which the Plaintiff may be compensated:
1. Past, present and future physical pain and suffering resulting from the injury, if any;
2. Past, present and future mental anguish, or mental suffering resulting from the injury, if any;
3. Any liability by reason of doctor, hospital and drug bills, past, present and future, which he incurred as a result of the accident which is the subject of this lawsuit, or which is reasonably probable to occur, if any;
4. Physical disability consisting of loss of physical function, if any, proximately resulting from said injury; and if a preponderance of the evidence be permanent, compensation therefor should be calculated on the basis of the life-expectancy of the Plaintiffs.
5. Loss of earnings to date and loss of future earning capacity, if any, proximately resulting from his injuries.
And in determining and fixing the amount of damages to be awarded him, if any, it is your sworn duty to give him fair and reasonable compensation for any and all damages which a preponderance of the evidence shows he has suffered as a proximate result of his injury, if any.
The question presented for this Court is whether, taking into consideration the standard of review and the authorities set out above, Moody should have been granted an additur or new trial on the issue of damages.
With regard to the loss of past, present and future earnings, the jury could have reasonably determined that Moody did not present persuasive evidence. Moody's testimony regarding his post-accident income was contradictory. He at one point said he was making less money in the live bait business (as opposed to commercial shrimping), but then indicated on the next page of transcript that he was probably making more money in the live bait business. Further, Gregory testified that Moody was still shrimping commercially in 1990. The jury could have reasonably concluded that Moody's contradictory evidence did not entitle him to damages on this basis.
On the other hand, the evidence regarding physical pain and suffering and permanent disability was never contested or contradicted. The testimony elicited from Moody, his wife, his chiropractor, Hinkle, Click, taken with the various medical documents in which a medical history was given, all reflect that Moody suffered pain and discomfort as a result of his injuries. It was also undisputed that Moody now suffers from a permanent disabling condition.
The jury could have determined, taking into account Moody's inconsistent medical *883 histories and other evidence contrary to his position, that his injuries were not proximately caused by the car accident. The jury could have believed Moody suffered the injuries from some kind of work-related fall. In light of the evidence, however, it was also reasonable for the jury to determine that Moody's injuries were proximately caused by the car accident  Dr. McCloskey said it was common for someone to think they were not seriously injured at first when later they are diagnosed as having a herniated disk. He also said that Moody's condition was consistent with being caused by this type of car accident.
The jury obviously found that all of Moody's injuries which required extensive medical treatment were proximately caused by the accident in question. That conclusion is supported by the fact that the jury awarded Moody damages totaling his medical bills. Based on the verdict finding Dominoes liable for the exact amount of the medical bills, $17,740.74, it is difficult to draw any other conclusion. Although Moody admitted that he reinjured himself when he disobeyed his doctor's orders by going out to his boat and attempting to pick up a wrench, and also when he subsequently hurt himself lifting batteries, this case is not analogous to the Leach contributory negligence reduction in damages scenario. In Leach, the jury could have believed that the injured son had contributed to his own injuries by causing his father to strike him in self-defense. In other words, the injury itself could have been partially caused by the son's negligence.
In this case there is no evidence that Moody negligently contributed to the car accident. Again, the jury could have found against Moody in his assertion that the car accident proximately caused his injuries. Once, however, the jury determined that the car accident was the proximate cause of Moody's injuries, there was no issue of contributory negligence. It is true that Moody disobeyed doctor's orders by going to the boat dock when he was released from the hospital after his operation, and that he returned to the hospital for two or three days as a result of that behavior. Nevertheless, unlike the case of Brake v. Speed, there was no evidence in the present case showing that Moody's subsequent negligence proximately caused any of the injuries he complains about. There was no evidence that Moody's ultimate recovery would have been any better in the absence of his actions after being released from the hospital. In fact, Dr. McCloskey testified that although Moody was readmitted to the hospital as a result of his actions, there were no further findings. Dr. McCloskey stated that "[w]e just put him in, had him settled down. He was in the hospital for two days. He improved satisfactorily and there didn't seem to be any complications, and he went home."
For these reasons, the verdict was against the overwhelming weight of the evidence. The jury found Dominoes liable for all of Moody's medical expenses, yet they failed to award any damages for pain and suffering where the evidence of pain and suffering was never contested or contradicted at trial. In light of additional error occurring at trial, discussed infra, we find that a new trial on the issue of damages alone is the appropriate remedy in the case at hand.

III.

WHETHER THE COURT ERRED IN ALLOWING HEARSAY TESTIMONY BY DR. FINEBURG REGARDING STATEMENTS BY HIS EMPLOYEES?
Dr. Fineburg examined Moody on June 20, 1989. Dr. Fineburg testified by deposition to the following information contained in Moody's medical file:
[t]he history relates right shoulder and neck pain for several days. Fall, seen at the emergency room two days ago, here for recheck. My physical examination shows my abbreviations for paraspinal muscle tenderness, and spasm, and was treated with local creams. I have not seen him since. There is a note out to the side written by my office manager, it's her handwriting on the side. It says 8/3/89, and then in parentheses it says from MVA. And I asked her about this, what this meant; this was not written at the time of my office visit. She said this  he came in on that date, on 8/3/89, and said that was not from a fall, it was from an MVA. I *884 was not aware he came in at that time. I was not aware of any additional history other than what I originally mentioned.
Moody's precise hearsay objection to Dr. Fineburg's testimony is not that the notation "8-3-89 from M.V.A." was admitted into evidence, but that Dr. Fineburg was allowed to testify as to subsequent oral statements made to him by an employee regarding the alleged circumstances under which this notation was entered into his office records. The defendants argue that the testimony of Dr. Fineburg was not inadmissible hearsay, that Moody waived his objection by failing to object during Dr. Fineburg's deposition, and that in any event, Moody was not prejudiced by this testimony.
Prior to the deposition testimony of Dr. Fineburg being admitted at trial, Moody's counsel entered an objection on the record:
BY MR. HUNTER: No, sir. I have no problem with the bottom entry of 6/20/89 being entered. I'm objecting to the hearsay testimony of the witness, Dr. Fineburg, regarding what someone in his office may or may not have told him since that person is not here for cross-examination. I'm willing to show to the Court the printed deposition, exactly what it shows with regard to any stipulations and so forth so the Court can review it.
The following was apparently stipulated between the parties prior to the taking of Dr. Fineburg's deposition:
That all objections, except as to the form of the questions and the responsiveness of the answers, are reserved until time as this deposition, or any part thereof, may be used or is sought to be used in evidence.
However, at the outset of the deposition, as was recorded and played for the jury at trial, the following discussion took place between the lawyers:
BY MR. WHITFIELD: I was going to get to that. In the sense I intend to use this as a trial deposition, we need to make sure that all of the objections to the doctor's testimony need to be made on the record so that they can be cured if possible here today. Certainly those objections which are uncurable sitting here today in the doctor's office we will have to take up before the Court. So, I would submit that we follow the civil procedure rules with reference to objecting on the record to any type of form or even procedural or substantive objection that one or the other of us has.
BY MR. CUMBEST: With that being the stipulation, with reference to that statement we still reserve our rights to object to protect any future question that might be posed.
BY MR. WHITFIELD: All right. The record has been made doctor.
It is clear that defense counsel intended to make it incumbent on plaintiff's counsel to make any objections he wished to reserve for purposes of objecting at trial during the deposition. It is also equally clear that Moody's counsel wished to stipulate, and apparently there was a stipulation, that all objections, except as to the form, were reserved until the deposition was to be used at trial.
Whether or not Moody's counsel properly preserved his hearsay objections must be answered by looking at the Mississippi Rules of Civil Procedure. Miss.R.Civ.P. 30(c) states the following:
(c) Examination and Cross-Examination; Record of Examination; Objections. Examination and cross-examination of witnesses may proceed as permitted at the trial. The testimony of the witness shall be recorded either stenographically or as provided in subsection (b)(4) of this rule. If requested by one of the parties, the testimony shall be transcribed upon the payment of the reasonable charges therefor. All objections made at the time of the examination to the qualifications of the person taking the deposition, or to the manner of taking it, or to the evidence presented, or to the conduct of any party, and any other objection to the proceedings, shall be noted upon the transcription or recording. Evidence objected to shall be taken subject to the objections. In lieu of participating in the oral examination, parties may serve written questions on the party taking the deposition, who shall propound them to the *885 witness and see the answers thereto are recorded verbatim.
(Emphasis added). Further, Miss.R.Civ.P. 29 states:
Unless the court orders otherwise, the parties may by written stipulation (1) provide that depositions may be taken before any person, at any time or place, upon any notice, and in any manner and when so taken may be used like other depositions, and (2) modify the procedures provided by these rules for other methods of discovery, except that stipulations extending the time provided in Rules 33, 34 and 36 for responses to discovery may be made only with the approval of the court.
(Emphasis added). According to these rules, Moody's counsel covered his tracks for purposes of preserving his objection to the alleged hearsay statement. The parties stipulated that the substantive objections would be reserved until trial. As mentioned above, Miss.R.Civ.P. 30(c) provides that "[a]ll objections ... to the evidence presented ... shall be noted upon the transcription or recording." It was noted in the record at the outset in the form of a stipulation that objections would be reserved until trial and it was stated just a little further into the deposition that the lawyers would be required to object. Moody is not to be deemed procedurally barred because he clearly raised the objection at trial.
The next question is whether or not the trial court allowed impermissible hearsay testimony to be submitted to the jury by way of Dr. Fineburg's video deposition. Miss. R.Evid. 801(c) defines hearsay as follows: "`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."
The statement Moody objected to was Dr. Fineburg's recollection of his office manager's explanation to him about the notation to the side of the medical history, "8-3-89 from M.V.A." Dr. Fineburg testified as to an oral statement from his office manager that Moody came into the office on August 3, 1989, and told her his injuries resulted from a car accident as opposed to a fall. Defendants argue that the statement was not offered in evidence to prove the truth of the matter asserted, but was merely put in evidence by Dr. Fineburg as an explanation for the presence of the notation on the document. The defendants' argument is persuasive. Dr. Fineburg certainly did not give this explanation to prove the truth of the matter asserted  i.e., to prove that Moody changed his story regarding the cause of his injuries. In fact, Dr. Fineburg explained that the notation should be completely discounted because it was not part of the original history. The doctor mentioned the notation because it was on the face of the document, it was confusing without explanation, and it needed to be explained away as not part of what he considered the medical history of this patient. There was no objection to the notation itself, and the testimony objected to merely explained the notation's presence on the document. See Eselin-Bullock v. National General, 604 So.2d 236 (Miss. 1992).

IV.

WHETHER THE COURT ERRED IN FAILING TO SUBMIT TO THE JURY THE $553.05 MEDICAL BILL FROM SINGING RIVER HOSPITAL SINCE IT WAS SUFFICIENTLY AUTHENTICATED AND SHOWN TO BE REASONABLY RELATED TO TREATMENT OF PLAINTIFF'S INJURIES?
Moody argues that the trial court erred in failing to admit into evidence the $553.05 medical bill from Singing River Hospital. This Court has stated:
When a party takes the witness stand and exhibits bills for examination by the court and testifies that said bills were incurred as a result of the injuries complained of, they become prima facie evidence that the bills ... were necessary and reasonable. However, the opposing party may, if desired, rebut the necessity and reasonableness of the bills by proper evidence. The ultimate question is then for the jury to determine.

Jackson v. Brumfield, 458 So.2d 736, 737 (Miss. 1984) (emphasis added); see Miss. Code Ann. § 41-9-119 (1972). Moody verified on direct examination that the total amount of medical bills that related to the treatment of *886 his injuries was $18,466.54 (that amount less his daughter's bill and the $553.05 bill from his hospitalization from July 15-17, 1989 equals $17,740.74  the exact amount of the jury's verdict). Dominoes contended at trial that the bills were not a result of the injuries complained of. Such argument was essentially a question of whether or not Dr. McCloskey had verified during his testimony that the bills were a result of the injuries in question. Surely, the jury could have reduced his damages by the amount of this bill based on Moody's admission that this hospitalization was the result of his failure to follow doctor's orders by going to the boat dock the day after he was discharged and attempting to pick up a wrench off the deck of his boat. However, based on Jackson v. Brumfield, 458 So.2d at 737, that was an issue for the jury. It was reversible error in refusing to allow the $553.05 bill to go to the jury. In conjunction with the jury's failure to award any damages for pain and suffering, we find that the appropriate remedy in the case at hand is a new trial solely on the issue of damages.

V.

WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT?
The standard of review of a denial of a j.n.o.v. is whether, upon the entire evidence, taken in the light most favorable to the verdict, no reasonable juror could have found as the jury found. Rester v. Lott, 566 So.2d 1266 (Miss. 1990). The defendants argue that the evidence completely fails to establish that Moody's injuries resulted from the car accident. The defense's cross-appeal is without merit. Dr. McCloskey testified that the injuries suffered by Moody were consistent with this type of accident. Moreover, there was testimony from Moody, his wife, Hinkle and Click that established the fact that his symptoms began at the time immediately after the accident. It cannot be said that no reasonable juror could have found as the jury did in this case. There is ample evidence supporting a finding of liability. The analysis under assignments one and two provides further support for the conclusion that the defendant's request for a j.n.o.v. was properly denied in this case.
ON DIRECT APPEAL: REVERSED AND REMANDED FOR A NEW TRIAL ON THE ISSUE OF DAMAGES. ON CROSS-APPEAL: AFFIRMED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and PITTMAN, BANKS, McRAE, JAMES L. ROBERTS and SMITH, JJ., concur.