# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1998-CA-01215-SCT

*CHOCTAW MAID FARMS, INC.*

*v.*

*ELIZABETH F. HAILEY, INDIVIDUALLY AND*

*AS ADMINISTRATRIX OF THE ESTATE OF*

*THOMAS H. HAILEY, DECEASED*

### ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 05/04/1998 |
| TRIAL JUDGE: | HON. LARRY EUGENE ROBERTS |
| COURT FROM WHICH APPEALED: | KEMPER COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | FRED KRUTZ, III |
| | MARK C. CARLSON |
| | WALTER H. BOONE |
| | BYRON HANSBRO |
| ATTORNEYS FOR APPELLEES: | EDDIE BRIGGS |
| | HENRY PALMER |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED-05/30/2002 |
| MOTION FOR REHEARING FILED: | 11/27/2001; 7/1/2002; dismissed 8/8/2002 |
| MANDATE ISSUED: | 8/15/2002 |

**EN BANC.**

**McRAE, PRESIDING JUSTICE, FOR THE COURT:**

¶1. The motion for rehearing is granted. The original opinions are withdrawn, and these opinions are substituted therefor.

¶2. This is a wrongful death case in which there is no dispute that a motor vehicle crash occurred and

caused the death of Thomas H. Hailey. Choctaw Maid Farms, Inc. ("CMF") appeals the circuit court's grant of a directed verdict against it on liability, the award of loss of enjoyment of life (hedonic damages) to Hailey and alleges other trial court errors, concerning evidentiary ruling on photos and videotape, failure to grant a continuance concerning the timely disclosure of expert, expert testimony on enjoyment of life and the, refusal to grant various instructions, all totaling eleven issues. The administratrix of Hailey's estate cross-appeals the court's refusal to allow an instruction regarding punitive damages to be submitted to the jury. We affirm both appeals and, therefore, affirm the judgment of the circuit court as to all issues.

¶3. In the pre-dawn hours of July 18, 1996, Tom Hailey was traveling in the southbound lane of Mississippi Highway 21, in heavy fog, from Philadelphia, Mississippi, to begin a day of work in Forest, Mississippi. Odell Frazier, a CMF employee, was hauling his last load of chickens from the McDill Farm to the processing plant in Carthage, Mississippi. Shortly after pulling out of a private drive onto Highway 21 and into the Hailey's lane of travel (a country turn), Frazier's trailer and Hailey's vehicle collided. While the tractor part of Frazier's rig was entirely in the northbound lane, the trailer angled across the foggy highway over 17 feet into Hailey's lane of traffic, at an angle of slightly less than 90 degrees from the center line. Frazier pulled onto the highway though his visibility was impaired due to the fog, and his trailer remained in Hailey's lane for over twenty seconds. The accident occurred entirely within Hailey's southbound lane of travel. Hailey died as a result of injuries sustained in the wreck.

¶4. The administratrix of Hailey's estate, Elizabeth F. Hailey ("Hailey"), filed this wrongful death action. The trial court granted a directed verdict against CMF on the issue of liability, and also granted CMF a comparative negligence instruction regarding any potential liability on the part of Hailey. The jury found that CMF's negligence was **ninety percent (90%) and that of the deceased to be ten percent (10%)**. CMF and Hailey appealed.

## STATEMENT OF THE ISSUES

**I. Whether the trial court erred in granting a directed verdict against CMF and Odell Frazier based on negligence and proximate cause.**

**II. Whether the trial court erred by granting jury instruction C-4.**

**III. Whether the trial court erred in failing to grant a continuance or other relief due to the delay of disclosure of testimony by expert witnesses.**

**IV. Whether the trial court improperly allowed expert testimony about loss of income damage calculations.**

**V. Whether the trial court erred by granting jury instruction C-11.**

**VI. Whether the trial court erred in its refusal of CMF's proposed jury instruction D-16.**

**VII. Whether the trial court erred in its refusal of proposed jury instructions D-7, D-8, D-9, D-13 and D-15.**

**VIII. Whether the trial court properly admitted Hailey's videotape of photographs into evidence.**

**IX. Whether the trial court made proper inquiry into the issue of juror misconduct.**

**X. Whether the trial court properly permitted testimony regarding Hailey's enjoyment of life.**

**XI. Whether the trial court erred in submitting hedonic damages as recoverable damages.**

**XII. (Cross-appeal) Whether the trial court committed reversible error by refusing to permit Hailey to submit the issue of punitive damages to the jury.**

## DISCUSSION

### I. Whether the trial court erred in granting a directed verdict against CMF and Odell Frazier based on negligence and proximate cause.

¶5. When the trial court granted a directed verdict against CMF on the issue of liability, the court also granted CMF a comparative negligence instruction regarding any potential liability by Hailey. As a result, the judge informed the jury that CMF was **not the sole proximate cause of the wreck**. Jury instruction C-6 stated "[t]he Court instructs the jury that the actions of [CMF] by and through its employee, caused or contributed to the death of Thomas H. Hailey. Therefore, you shall return a verdict in favor of the plaintiff." The jury then had the right to assign a percentage of fault to both CMF and Hailey. The jury found that CMF's negligence was **ninety percent (90%) and that of Hailey to be ten percent (10%)**.

¶6. In a case very similar to the facts presented before us, *Anderson v. Eagle Motor Lines, Inc.*, 423 F.2d 81 (5th Cir. 1970), an employee of Eagle Motor Lines was operating a truck and trailer rig on a public highway in fog in the early morning hours. In an attempt to change directions, the driver pulled his truck into a private driveway on the south side of the highway and was re-entering the highway and blocking both lanes when he was struck by the plaintiff's vehicle. The Fifth Circuit applying Mississippi law in affirming the trial court's finding for the plaintiff held:[1]

> The evidence was uncontradicted that Mississippi Highway 550 is a well-traveled road, that the tractor-trailer completely blocked both lanes of traffic and that this occurred prior to sunrise which was at 6:50 on the morning of the accident, and that visibility was at best limited. Prudence would have required Jones to have moved his rig on to the shoulder of the road either to await full daylight or to place the necessary flares, or to have continued in his own lane until he found an appropriate intersection for completing the maneuver. Instead, Jones risked the possibility of collision against the possibility of completing the dangerous turn within the few moments when the road appeared to be clear of traffic. He exercised bad judgment under the circumstances.

*Anderson*, 423 F.2d at 85.

¶7. In another similar case, *U.S. Indus., Inc. v. McClure Furniture Co. of Eupora*, 371 So.2d 391 (Miss. 1979), we held that when the defendant backed his truck across a much traveled highway at a time when it was dark without making any attempt to flag or warn traffic on the highway and ultimately was struck by the plaintiff's vehicle, a verdict for the defendant would have been against the overwhelming weight of the evidence. "The decision to grant a directed verdict is one of law." *McKinzie v. Coon*, 656 So.2d 134, 137 (Miss. 1995).

¶8. However, CMF incorrectly looks to *McKinzie* for support. In *McKinzie*, this Court actually held that the circuit court erred in **not** directing a verdict against the defendant on the issue of negligence. The plaintiff was traveling west on Highway 98 and collided with a car which had pulled into the intersection when the plaintiff's vehicle was 75 feet away. Considering that the plaintiff had the right-of-way, there were no traffic signals to hinder travel in a direct course and no fault was attributed by the investigating officer, we held that a directed verdict in favor of the plaintiff was proper.

¶9. In *Walton v. Owens*, 244 F.2d 383 (5th Cir. 1957), the Fifth Circuit, applying Mississippi law, affirmed the trial court's grant of a peremptory instruction on negligence. In that case, the instruction was granted against the plaintiff for pulling from a private road onto U.S. Highway 61 and colliding with the defendant, who was traveling down Highway 61. The evidence at trial was contradictory as to whether the plaintiff stopped at the stop sign prior to entering the highway, but the court held that by entering the highway, the plaintiff was taking an obvious risk with regard to the safety of himself and others on the highway. As a result, a contributory negligence instruction was properly given in favor of the defendant. The court wrote:

> Reasonable men could not conclude that safety on the highway, which is the object of the Mississippi Statutes and decisional law, would permit a person to take such chances in the optimistic expectation or hope that, while shaving it closely, speed, power, skill, or good fortune would let it succeed.

*Id.* at 387.

¶10. CMF relies heavily upon the argument that Hailey had a duty to yield to vehicles entering the roadway from an intersection. However, the evidence produced at trial showed that the accident occurred not at an intersection, but 100 feet north of a driveway to the Choctaw Maid premises. When the accident occurred, Frazier's tractor lights were in the proper lane of traffic facing Hailey's vehicle, but his trailer was in the other lane for over twenty seconds. Because of the dense fog, the fact that the reflectors had been painted over, and other factors, the trailer was understandably not visible to Hailey. The jury found that Frazier caused the accident by taking up two lanes of traffic when turning onto a highway during a time at which his visibility was almost nonexistent.[2] The trial court's instructions were correct due to Frazier's indisputable negligence. The fact that the jury placed 90% of the fault upon Frazier is a strong indication that the jury found him to be the negligent party in this case.

¶11. The trial court did not err in granting a directed verdict as to negligence and also allowing a comparative negligence instruction.

### II. Whether the trial court erred by granting jury instruction C-4.

¶12. This assignment of error is based on the presumption that the trial court also erred in directing the verdict on liability and on proximate cause. We do not find the trial court to have ruled improperly with regard to the directed verdict. Therefore, it is not necessary for us to address this issue. We uphold the trial court's decision to grant jury instruction C-4.

### III. Whether the trial court erred in failing to grant a continuance or other relief due to the delay of disclosure of testimony by expert witnesses.

¶13. Hailey first designated experts in August of 1997. About 90 days before trial, Hailey supplemented this response as it related to reconstruction expert Richard Turner ("Turner"). Although, CMF had properly

requested all documents and/or other tangible items that Hailey's experts were expected to rely upon, no additional information was provided supporting Turner's claims until his deposition was taken on April 8, 1998, three weeks before trial. During his deposition, Richard Turner testified that he reached his opinion regarding Hailey's speed based upon computer data compilations of test crash data, data compilations of specific measurements of different types of vehicles, the amount of crush as measured from photographs of the vehicle after the crash and a computer program which calculates speed from a combination of these data. None of this information was revealed to CMF prior to the deposition.

¶14. The burden is on the party sponsoring the expert witness to fully and completely supply responses to interrogatories and requests for production of data when it concerns experts. *T. K. Stanley, Inc. v. Cason*, 614 So. 2d 942, 950 (Miss. 1992): Miss. R. Civ. P. 26(b)(4)(A)(i) requires that, upon request from the opposing party, a party must disclose not only the name of his expert witnesses, but he must also "state the subject matter on which the expert is expected to testify, . . . the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion."

¶15. On April 20, 1998, CMF filed its motion for a continuance or in the alternative, to strike the testimony of Turner, or in the alternative, to allow CMF to designate an additional expert. The trial court concluded that Hailey had fully complied with discovery by giving the expert's name, opinion and bases for the opinion. The court denied the motion to strike and the continuance.

¶16. The trial court erred in its determination that Hailey had properly complied with discovery. The request for production of documents was clear and was well within the range of discoverable material. *Square D. Co. v. Edmonds*, 419 So.2d 1327, 1328 (Miss. 1982). As Turner's opinion was based in part upon computer data compilations concerning test crashes, as well as data compilations concerning the specific measurements of the vehicle in question, that data should have been disclosed.

¶17. The question now is whether such disclosure was seasonable and, if not, whether the failure to make such disclosure is reversible error under the circumstances of this case. In determining whether the disclosure is seasonable, the paramount consideration is whether it was disclosed in time for the responding party to adequately examine, challenge and defend against the information. *Motorola Comm. & Elecs., Inc. v. Wilkerson*, 555 So.2d 713, 718 (Miss. 1989); *Jones v. Hatchett,* 504 So.2d 198, 201 (Miss. 1987) (stating purpose of our civil discovery procedures is to prevent trial by ambush). In this case, the data compilation was delivered to CMF on the date of the hearing six days before trial. However, CMF's accident reconstructionist testified on cross-examination that he was familiar with the type of computer data compilations and programs used by Hailey's expert and had used similar tools himself. He disputed the use of crash test data in this case based upon the fact that test crashes are done with stationary barriers while in this case the "barrier," the tractor-trailer, was moving.

¶18. While CMF preserved the issue of the failure to grant a continuance by citing it as grounds for a new trial, it did not present the court with any new information as to what it would have done differently had a continuance been granted. It appears from the record that its expert was adequately prepared to deal with the data in question. Moreover, the data related only to the speed of Hailey's car. CMF's expert opined that it was at least 50 miles per hour, and Hailey's expert opined that it was no more than 35, or perhaps 38, miles per hour. CMF sought to demonstrate that either speed might be excessive under the visibility circumstances. On this conflicting evidence, the jury found Hailey negligent.

¶19. Under the circumstances we do not find an abuse of discretion in failing to grant a continuance or other

relief due to the delay in disclosing the use of the computer data compilations here at issue. ***Illinois Cent. R.R. v. Gandy,*** 750 So. 2d 527, 532 (Miss. 1999) (trial court did not err in failing to grant a motion for a continuance because of a delay in expert witness disclosures). *See also* ***Robert v. Colson***, 729 So. 2d 1243, 1245 (Miss. 1999) (trial courts have considerable discretion in discovery matters and decisions will not be overturned unless there is an abuse of discretion).

### IV. Whether the trial court improperly allowed expert testimony about loss of income damage calculations.

¶20. CMF argues that the trial court improperly allowed expert testimony regarding loss of income damage calculations. During closing arguments Hailey asked the jury to return a verdict of $1,220,511.50 for lost earnings. The jury complied with Hailey's request.

¶21. CMF asserts the amount was based upon the expert testimony of Carroll David Channell. Over CMF's objections, Channell was permitted to testify about three different options for calculating lost wage damages: (1) the present value of Hailey's salary at the time of his death; (2) the present value of the average college graduate's salary which was substantially more than Hailey was earning; and (3) the present value of a job at Farm Bureau.

¶22. CMF finds the proper measure for determining lost income damage to be the salary at the time of death. According to CMF, any information about what the average college graduate earns or what Hailey might have earned at Farm Bureau is speculative and improper, especially since the only step taken to get the Farm Bureau job was the completion of an application. CMF believes that the jury awarded $889,912.50 more than the present value of his earnings at the time of death.

¶23. CMF contends that evidence as to a decedent's intention to enter an occupation other than the one engaged in at the time of death was improper. ***Clary v. Breyer***, 194 Miss. 612, 13 So.2d 633 (1943); ***Gulf & S.I.R. Co. v. Boone***, 120 Miss. 632, 82 So. 335 (1919). CMF argues that these cases make it clear that testimony about the possibility of future jobs is not appropriate in Mississippi courtrooms and allowing such testimony was error. Hailey avers that the figures testified to by Channell were simply guidelines that the jury could utilize in determining the loss of income damage. It is also noted that Channell suggested the jury start with the college graduate figure, since Hailey was a college graduate.

¶24. This Court has held that "there is no exact yardstick for [determining] such damages." ***Bush Constr. Co. v. Walters***, 250 Miss. 384, 394,164 So.2d 900, 903 (1964).

> [N]umerous cases have held that in assessing the beneficiaries' loss, the trier of fact may consider the decedent's financial condition, and station in life. Among matters whose consideration by the trier of fact has been approved are the occupation of the decedent at the time of his death, and other occupations he was qualified to fulfill, or intended, eventually, to fulfill. Also taken into consideration is the decedent's ability to earn money in general, his disposition to earn, and the amount he was earning at the time of his death and, under some circumstances, at a considerable period of time prior to his death.

22 Am. Jur. 2d *Death* § 284 at 337-38 (1988) (footnotes omitted). Hailey argues it was, therefore, within the discretion of the court to permit this type of evidence.

¶25. The cases cited by CMF are clearly distinguishable. ***Clary*** is inapplicable to the case at bar, because it

addresses the issue of someone who had been trained in a field and who had not worked in that field at least four years prior to her death. Likewise, *Gulf & S.I.R. Co. v. Boone* is not applicable to this case because it dealt with a decedent who had not made any plans regarding his profession after he left the Army. Here, Hailey had been trained, received a college degree, was working and was absolutely qualified to be a "typical college graduate" and to receive the earnings commiserate therewith.

¶26. We see no error in allowing this testimony.

### V. Whether the trial court erred by granting jury instruction C-11.

¶27. CMF contends that the trial court committed error when it gave Jury Instruction C-11, which provided that: The Court instructs you that if you find from the evidence that at the date and time of the accident Thomas H. Hailey was traveling South on Mississippi Highway No. 21 and if you further find that Thomas H. Hailey was operating his vehicle at a reasonable rate of speed for the conditions then and there existing at the time the accident took place and keeping a proper lookout, then Thomas H. Hailey was not negligent.

¶28. CMF argues that Hailey's negligence, in part, depended on who had the right-of-way (i.e., if Frazier determined that Hailey did not present an immediate hazard at the time he entered the highway, then Frazier had the right-of-way and Hailey was required to yield). CMF maintains that this instruction was improper, even if Hailey was traveling at a safe speed and kept a proper lookout. Hailey could still have been found negligent if he failed to yield the right-of-way to Frazier. Thus, the argument goes, the above instruction did not properly instruct the jury as to the applicable law. Instead, the instruction confuses right-of-way with keeping a proper lookout; these are separate theories. *Church v. Massey*, 697 So. 2d 407, 411 (Miss. 1997) ("[f]ailure to yield the right-of-way and failure to keep a reasonable lookout are two distinct theories of liability."); *Mills v. Nichols*, 467 So. 2d 924, 929-30 (Miss. 1985).

¶29. The jury was specifically instructed that Hailey must have been keeping a proper lookout and driving at a reasonable rate of speed at the time of the accident before the jury could find that Hailey was not negligent. The jury determined that Hailey was 10% negligent. We conclude that the instructions as a whole adequately presented the issue of comparative negligence. *Fielder v. Magnolia Beverage Co.,* 757 So. 2d 925, 929 (Miss. 1999) (if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found).

### VI. Whether the trial court erred in its refusal of CMF's proposed jury instruction D-16.

¶30. CMF contends that the morning of July 18, 1996, when Hailey's vehicle struck the trailer, was foggy with a visibility of 100 feet, at most. CMF submitted Jury Instruction D-16 which, CMF insists, accurately reflects the law under these circumstances:

> You are instructed that, under Mississippi law, a driver of a vehicle has a duty to drive his car at a speed at which it can be stopped within his range of vision when something hinders the driver's vision. You are also instructed that a driver must drive at such a speed as to be able to stop when an obstruction becomes visible through the fog.

> If you find from a preponderance of the evidence that Thomas Hailey could not have stopped his vehicle within the range of his vision when he determined that the Choctaw Maid tractor trailer rig was turning onto Highway 21, and that such inability to stop was a proximate contributing cause of the collision with the Choctaw Maid Farms tractor trailer rig, then you shall find contributory negligence

on the part of Thomas Hailey.

¶31. CMF states that since Hailey was driving in a heavy fog with restricted visibility, he was required to drive at a rate of speed which would permit him to stop within his range of vision. The general rule is well established that it is negligence for a motorist to operate an automobile on a highway at such speed that it cannot be stopped within the range of the driver's vision. *Butler v. Chrestman*, 264 So. 2d 812, 815 (Miss. 1972). Hailey argues that after the refusal of instruction D-16 submitted by CMF, the court then granted instruction C-14 which rewords D-16 and accurately reflects the law as it exists in the State of Mississippi:

> You are instructed that under the law of the State of Mississippi that when a driver's vision is reduced or blinded to the extent that he cannot see in front of him at a distance within which he can stop his car at the rate of speed he is traveling, he is required to reduce speed and bring his car within such speed so that he can stop within the range of his vision.

> Under the circumstances existing on July 18, 1996, if you believe that Thomas Hailey's vision was reduced or blinded to the extent that he could not see in front of him at a distance within which he could reduce his speed and stop his vehicle, then he had a duty to reduce his speed and bring his vehicle to a speed in which he could stop his vehicle within his range of vision. If he failed in this duty, then he was negligent. If you believe that this negligence, if any, contributed to the accident, then you shall assign a percentage of fault to him.

¶32. We agree with Hailey and find no error in the trial court's grant of instruction C-14 and its refusal of CMF's proposed instruction D-16.

### VII. Whether the trial court erred in its refusal of proposed jury instructions D-7, D-8, D-9, D-13 and D-15.

¶33. CMF argues that the trial court erred in refusing instructions D-7, D-8, and D-9, D-13 and D-15 which properly stated Mississippi law with respect to negligence and proximate cause and correctly defined those elements. In particular, CMF maintains that these instructions correctly stated that it was Hailey's burden to prove negligence and proximate cause. However, CMF concludes that because the trial court improperly directed the verdict on negligence and proximate cause, these instructions were also improperly refused. Because we conclude that the court properly granted a peremptory instruction, we need not further consider this point.

### VIII. Whether the trial court properly admitted Hailey's videotape of photographs into evidence.

¶34. CMF also believes that the videotape admitted into evidence by the trial court was designed to, and did, solicit undue sympathy and inflame the passions of the jury. It maintains that the danger of undue prejudice greatly outweighed the probative value of the evidence and, hence, the videotape should have been excluded pursuant to Miss. R. Evid. 403. *See Butler v. Chrestman*, 264 So. 2d at 816. Further, CMF argues that the videotape was hearsay and cumulative of the testimony of the Hailey's witnesses and should have been excluded on that basis.

¶35. Hailey argues that this was not a "Day in the Life of" video. Videotapes have commonly been accepted as probative evidence to prove loss of society and companionship claims, and their use has been approved

by this Court. The following cases support this proposition and leave this decision to the discretion of the trial court. *Mills v. Nichols*, 467 So.2d at 930; *Butler v. Chrestman*, 264 So. 2d at 816; *Niles v. Sanders*, 218 So.2d 428, 432 (Miss. 1969).

¶36. We have viewed the videotape and find no error in its admission. While some of the pictures present borderline Miss. R. Evid. 403 problems, it was not an abuse of the court's discretion to admit them with the film as a whole. *Motorola Comm. & Electronics v. Wilkerson*, 555 So.2d at 721.

### IX. Whether the trial court made proper inquiry into the issue of juror misconduct.

¶37. CMF argues that during the trial, a situation arose which led to questions about the truthfulness of a prospective juror during voir dire. During voir dire, the entire panel was asked whether they knew any of the witnesses in the case, including a potential witness for the plaintiffs, Robert Luke ("Luke"). No one responded affirmatively. However, while counsel for both parties were in chambers selecting the jury, a paralegal for CMF's counsel allegedly saw a potential juror, Puckett, greet and shake hands with Luke. Puckett was ultimately selected as a juror in this case.

¶38. The court conducted an examination of Juror Puckett with regard to the alleged hand shaking. Puckett denied shaking hands with Luke or having any personal knowledge of Luke that would have required him to affirmatively answer any voir dire questions presented to him. However, when asked by CMF, Puckett admitted that he knew of Luke because he knew Luke's mother and recognized him in the courtroom.

¶39. CMF contends that the trial court erred by not removing Juror Puckett from the panel. In addition, it maintains that the trial court erred by not conducting the entire examination of Juror Puckett. Such failure placed counsel for CMF in the position of conducting the remainder of the examination, which cast CMF in a bad light in the eyes of the jury and may have offended Juror Puckett. CMF believes that the prejudice suffered was clear, given the unanimous verdict for Hailey.

¶40. On the issue of juror misconduct, this Court held in *Fleming v. State*, 687 So.2d 146, 148 (Miss. 1997), that:

> [f]ailure to respond to a question in voir dire does not warrant a new trial unless the trial court determines that the question propounded to the juror was 1) relevant to the voir dire examination, 2) unambiguous, and 3) such that the juror had substantial knowledge of the information sought to be elicited. If the trial court answers these three inquiries in the affirmative, then the court determines whether prejudice to the defendant could be inferred. If so, then a new trial is ordered.

¶41. The record is clear, from the questions posed, that the juror does not know Luke, which constitutes a failure to meet the *Fleming* test. The record also shows that CMF's attorney's paralegal did not know who the juror had contact with. Finally, assuming that CMF could satisfy the elements of the foregoing test relative to this tenuous juror misconduct issue, the Court in *Fleming* held that if a juror's response had created a peremptory challenge which did not rise "to the dignity of a challenge for cause, our courts have greater discretion" to determine whether a new trial is warranted.

¶42. In any event, Hailey argues that the testimony of the juror in question and CMF's paralegal does not rise to the level of a challenge for cause. We agree. There is not enough proof in the record to support CMF's allegation of juror misconduct. The fact that the potential problem witness did not testify and was not listed as a witness, confirms our conclusion that there is no ground for reversal based on this assignment

of error.

## X. Whether the trial court properly permitted testimony regarding Hailey's enjoyment of life.

¶43. Hailey's counsel called numerous character witnesses, who testified about Hailey and his family. Many of the witnesses testified about Hailey's loss of enjoyment of life. CMF argues that this testimony was irrelevant since hedonic damages are not recoverable in wrongful death cases.[3] CMF contends that the purpose, intent and effect of putting these witnesses on the stand was the needless presentation of cumulative evidence which was irrelevant and to unfairly prejudice CMF. CMF also maintains that the trial court erred in allowing this testimony pursuant to Miss. R. Evid. 403.

¶44. Hailey contends that the court did not err in permitting character witnesses to testify regarding loss of society, companionship and enjoyment of life of the deceased. The testimony of these witnesses was not unduly cumulative or prejudicial as they testified to necessary elements of the plaintiff's claim for damages.

¶45. In *Carr v. State*, 208 So.2d 886, 888 (Miss. 1968), this Court held that where a defendant offered twenty character witnesses, the trial court properly limited the testimony on this point to eleven character witnesses. Hailey argues that while the testimony in the case at bar and in *Carr v. State* is cumulative, it is necessary to prove the essential elements of plaintiffs' claims. Hailey had approximately sixteen potential witnesses to testify on enjoyment of life and loss of society issues. However, the court limited this testimony to five witnesses. This does not violate any rule, standard or proscription enunciated by this Court.

¶46. In *Stancill v. McKenzie Tank Lines, Inc.*, 497 F.2d 529, 537 (5th Cir. 1974), the court held that the admission of cumulative "testimony, even if it was error, was harmless." Accordingly, Hailey submits that the court properly permitted the foregoing witnesses to testify. We hold that if any error was committed, it was harmless and did not affect the substantive rights of CMF.

## XI. Whether the trial court erred in submitting hedonic damages as recoverable damages.

¶47. The right to recover for loss of enjoyment of life is included in Miss. Code Ann. § 11-7-13 (Supp. 2001) which states that in a wrongful death case, the person bringing suit is **entitled to recover all damages of every kind and nature which might have been awarded to the decedent had he lived**, and any damages for which the decedent's wrongful death beneficiaries sustained by reason of his death. The issue of loss of enjoyment of life was properly submitted to the jury by the trial court, and the damages awarded were not contrary to the overwhelming weight of the credible evidence.

¶48. The statute plainly states "the fact that death was instantaneous shall in no case affect the right of recovery." *Id*. Although the language employed by the Legislature in the wrongful death act is far-reaching, it is clear. In keeping with this statute, we have previously upheld an award of loss of enjoyment of life (hedonic damages) in a wrongful death suit. *See Thomas v. Hilburn,* 654 So.2d 898 (Miss. 1995). The main difference between *Thomas* and the case sub judice is that the deceased in *Thomas* lived for six days before he died, whereas death was instantaneous in the present situation. *Thomas,* 654 So.2d at 900. This presents the question: How much enjoyment of life could one lose in six days? What if the deceased lived for six days (or six months or six years) in a coma? The distinction between those who may recover for loss of enjoyment of life becomes blurred when alternate scenarios are proposed. If enjoyment of life is proportional to the knowledge that one is able or unable to enjoy life, then it stands to reason that someone

in a coma would not be allowed to recover hedonic damages. Following this same logic, a party who lived only a few days should only be able to recover for the loss of enjoyment he suffered in those few days. How much is one day of enjoyment of life worth? To what extent does any particular injury prevent one from enjoying life?

¶49. Loss of enjoyment of life is just that - loss of the ability to enjoy life in the manner to which one has become accustomed. Alive, dead, in a coma or with bodily injuries, the individual is unable to function in a way which allows him to enjoy life. Loss of enjoyment of life (hedonic damages) is an attempt to recompense the injured party for his loss. Nothing in Miss. Code Ann. § 11-7-13 says or should be construed otherwise. We find, as per the trial court's ruling, that Hailey was properly allowed to recover damages for loss of enjoyment of life.

### XII. (Cross-appeal) Whether the trial court committed reversible error by refusing to permit Hailey to submit the issue of punitive damages to the jury.

¶50. In *South Cent. Bell v. Epps*, 509 So. 2d 886, 892 (Miss. 1987), this Court held that "there is no right to an award of punitive damages and such damages are to be awarded only in extreme cases." We held that the trial court judge should initially determine whether to submit punitive damages to the jury, and in making this determination, the trial court must review all of the evidence before submitting the issue of punitive damages to the jury. *Id.* at 893. A judge's decision not to send punitive damages to the jury will only be reversed upon a finding of an abuse of discretion. *Hurst v. Southwest Miss. Legal Servs. Corp.*, 708 So. 2d 1347, 1351 (Miss. 1998).

¶51. This Court has long recognized the utilization of punitive damages to punish the wrongdoer and to deter others from wanton or malicious conduct so that the public may be properly protected. *C & C Trucking Co. v. Smith*, 612 So. 2d 1092, 1105-06 (Miss. 1992); *Snowden v. Osborne*, 269 So.2d 858, 860 (Miss. 1972), *overruled on other grounds*, *Fowler Butane Gas Co. v. Varner*, 244 Miss. 130, 141 So.2d 226 (1962). Also, "[p]unitive damages may be recovered not only for willful and intentional wrong, but for such gross and reckless negligence as is, in the eyes of the law, equivalent to willful wrong." *Fowler Butane,* 141 So. 2d at 233-34; *Dame v. Estes*, 233 Miss. 315, 101 So.2d 644 (1958); *Bush v. Watkins*, 224 Miss. 238, 80 So.2d 19 (1955).

¶52. Hailey argues that CMF's conduct caused Hailey's death. CMF's failure to: (1) train Frazier in the proper rules of the road under the conditions as they existed at the time of the accident, (2) maintain drivers' logs and maintenance logs of its equipment as required by federal law, (3) require its driver and vehicle inspectors to be conversant in the state and federal regulations which govern the maintenance and operation of tractor-trailer, (4) preserve the drivers' logs and vehicle maintenance logs for inspection after the accident, (5) maintain red reflex reflectors as required by federal law to warn approaching motorists that the trailer was obstructing their path of travel, (6) have lights visible by welding winches, and (7) properly license the defendant's trailer for a period of more than four years, set up a pattern of conduct by CMF which provides facts and circumstances warranting submission to the jury of the issue of punitive damages as provided by Miss. Code Ann.§ 11-1-65 (Supp. 2001). Hailey claims that based upon the foregoing facts, there was clear and convincing proof of CMF's statutory violation(s), and the trial court committed reversible error in refusing to grant a punitive damage instruction.

¶53. CMF agrees with Hailey that § 11-1-65 provides, in pertinent part, that punitive damages may be awarded for "gross negligence which evidences a willful, wanton or reckless disregard for the safety of

others . . . " Miss. Code Ann. § 11-1-65(1)(a). However, CMF argues that the cases cited by Hailey demonstrate that the evidence in this case did not support the imposition of such damages.

¶54. The rule is that simple negligence is not of itself evidence sufficient to support punitive damages, but accompanying facts and circumstances "may be used to show that that portion of defendant's conduct which constituted the proximate cause of the accident was willful and wanton or grossly negligent." ***Pelican Trucking Co. v. Rossetti,*** 251 Miss. 37, 167 So. 2d 924, 926 (1964) (citations omitted).

¶55. The punitive damages statute requires a relation between the wrongful act and the harm that resulted. Miss. Code Ann. § 11-1-65. For instance, among the factors to be considered in the award of punitive damages is the "impact of the defendant's conduct on the plaintiff." *Id*. § 11-1-65(e). In addition, once the punitive damage verdict has been awarded, the trial court is required to determine "[w]hether there is a reasonable relationship between the punitive damage award and the harm likely to have resulted from the defendant's conduct **as well as the harm that actually occurred**."*Id*. § 11-1-65(f)(ii)(1) (emphasis added). Thus, the statute is clear that there must be some relation between the wrongful act and the harm that resulted.

¶56. In *Pelican Trucking,* we reviewed the award of compensatory and punitive damages in a tractor trailer accident case. The Court concluded that the accident was caused by the truck driver's simple negligence and that there was no evidence of any willful and intentional wrong or gross negligence on the part of the driver. 167 So. 2d at 926.

¶57. Here, as in *Pelican Trucking*, the primary cause of the accident was Frazier's negligence. There is no nexus between the alleged gross negligence of CMF and the accident.

¶58. To illustrate this point, CMF states that Hailey harps on insignificant facts, such as the trailer at issue having an expired license plate; the trailer being 18 years old and in a state of infrequent use; the missing log book; and Frazier's painted over reflectors. It is to suggest that an expired license or a missing log book caused or contributed to this accident. There was no evidence that the age and condition of the trailer had anything to do with this accident. Likewise, Hailey contends that Frazier's difficulty with the English language prevented him from being conversant with the Code of Federal Regulations. This does not reach any level of gross negligence. The record does indicate Frazier was properly trained and supervised, and duly licensed. Since there was no evidence to support a punitive damage instruction, the trial court is affirmed on this issue.

CONCLUSION

¶59. For the foregoing reasons, the direct and cross appeals are affirmed, and the judgment of the trial court is affirmed in all respects.

¶60. **AFFIRMED ON DIRECT APPEAL AND CROSS-APPEAL.**

**DIAZ, EASLEY, CARLSON AND GRAVES, JJ., CONCUR. CARLSON, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, C.J., AND EASLEY, J. COBB, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, P.J., AND WALLER, J.**

**CARLSON, JUSTICE, SPECIALLY CONCURRING:**

¶61. I agree with the conclusion reached by the majority, and I join its opinion. I write separately to offer additional comments on the issue of damages for the loss of the enjoyment of life, otherwise known as hedonic damages.

¶62. The majority is correct in concluding the trial court properly allowed the wrongful death beneficiaries to recover for the loss of the enjoyment of life.

¶63. Wrongful death actions are a creature of statute. In Miss. Code Ann. § 11-7-13 (Supp. 2001), the Mississippi Legislature provided that the party bringing suit in a wrongful death action shall recover "all the damages of every kind and nature." The Legislature also recognized in the statute that "the fact that death was instantaneous shall in no case affect the right of recovery." *Id.* According to our statutory interpretation, loss of the enjoyment of life is included and can be recovered by wrongful death beneficiaries. The statute does not indicate otherwise. If it is to be otherwise, it will be for the Legislature to so state.

¶64. The role of this Court is not to make laws. "Our role is to determine the legislative intent and constitutionality of acts passed by the Legislature, and if we interpret a statute contrary to the intent or will of the Legislature, that body has the absolute authority to change the statute to suit its will." *Board of Supervisors v. Hattiesburg Coca-Cola Bottling Co.*, 448 So.2d 917, 924 (Miss.1984) (Hawkins, J., concurring in part and dissenting in part).

¶65. The majority states that the language used by the Legislature in the Wrongful Death Act was far-reaching and should be liberally interpreted. But any interpretation of this statute, strict or liberal, should lead to the same conclusion--damages for the loss of the enjoyment of life are permitted because all damages of every kind and nature are permitted. Until the Mississippi Legislature indicates otherwise, this Court must interpret Miss. Code Ann. § 11-7-13 as written and allow wrongful death beneficiaries to recover damages for the loss of the enjoyment of life.

¶66. This having been said, I agree with the majority that this case should be affirmed.

### PITTMAN, C.J., AND EASLEY, J., JOIN THIS OPINION.

### COBB, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:

¶67. The majority adopts for the first time in this State, an award of hedonic damages[4] in a wrongful death action. In doing so, the majority has: misstated precedent; ignored federal courts' interpretation of Mississippi law; adopted the extreme minority position of jurisdictions that have considered this issue; failed to learn from the English experiment; and created duplicate awards and jury confusion. Because I would reverse and render the award of hedonic damages, I respectfully dissent.

### A. Mississippi Decisions.

¶68. In *Kansas City S. Ry., v. Johnson*, 798 So.2d 374 (Miss. 2001), we recently recognized that "damages for loss of enjoyment of life are recoverable as a separate form of damages" apart from pain and suffering, **in a personal injury action**. This Court has never allowed hedonic damages in a wrongful death action. Nevertheless, the majority sanctions the availability of hedonic damages in the wrongful death context seemingly without concern about the differences between the two actions. This Court has addressed the issue of hedonic damages in three cases: *McGowan v. Wright*, 524 So.2d 308 (Miss.

1988), ***Jones v. Shaffer***, 573 So.2d 740 (Miss. 1991), and ***Thomas v. Hilburn***, 654 So.2d 898 (Miss. 1995).

¶69. In ***McGowan***, the widow of a passenger who died instantly in an automobile accident brought a wrongful death suit against the estate of the driver who caused the accident. ***McGowan***, 524 So.2d at 309. The jury found that the only injuries suffered by the plaintiff were the funeral and ambulance expenses, and the plaintiff appealed on the issue of damages only. ***Id.*** We affirmed that judgment, holding that the jury was properly instructed to "[take] into consideration all the damages of every kind to the decedent and all the damages of every kind to any and all parties interested in this suit," which was a proper statement of the damages allowed under Mississippi's wrongful death statute. ***Id.*** at 311. Justice James L. Robertson dissented from the denial of the petition for rehearing, joined by two other justices. In ***McGowan***, Justice Robertson disputed the majority's holding that damages in a wrongful death case exclude the "non-pecuniary value" of the decedent's life. ***Id.*** at 312 (Robertson, J., dissenting). He went on to say: "Plaintiffs argue that there is an intrinsic value to life and that its loss should be compensated. Without engaging in such metaphysics, we think that there is at the least a social and psychological (i.e., non-pecuniary) value to life over and above any pecuniary value." ***Id.*** Justice Robertson supported his argument that wrongful death compensation extended to non-pecuniary loss by citing three cases in which this Court had awarded non-pecuniary damages for "loss of society and companionship." ***Id.***[(5)] Nowhere in his dissent does Justice Robertson assert that hedonic/loss of enjoyment of life damages are appropriate. In fact, Justice Robertson seems to reject the plaintiffs' claim concerning "an intrinsic value to life" and declines to "engage in such metaphysics."

¶70. In ***Jones v. Shaffer***, 573 So.2d 740, 743 (Miss. 1990), this Court addressed another wrongful death case in which the person died instantly. In the majority opinion, the entire discussion of hedonic damages was contained in a single footnote which construed the damages portion of the wrongful death statute, Miss. Code Ann. § 11-7-13, and ultimately concluded that this issue was not properly before the Court. ***Jones***, 573 So. 2d at 743 n.2. Unlike his dissent in ***McGowan***, in ***Jones***, Justice Robertson did expand his "non-pecuniary" recovery argument beyond "loss of society and companionship" to include "recovery for diminution of the joys of living." ***Id.*** at 746 (Robertson, J., concurring). Justice Robertson's concurrence was joined by the same two Justices who joined his dissent in ***McGowan***. Obviously, a concurring opinion joined by only two justices which addresses issues not before the Court cannot be considered to be binding precedent.

¶71. Finally, in ***Thomas***, we affirmed a $300,000 damages award in the death of L.B. Hilburn, a seventy-five year old man who died six days after being in an automobile accident. In ***Thomas***, the Court, speaking through Justice McRae, erroneously interpreted ***McGowan*** to extend wrongful death damages to include damages for loss of the enjoyment of life. However, as previously discussed, no such language is actually in ***McGowan***, not even in Justice Robertson's dissent, which merely discusses non-pecuniary injuries such as loss of society and companionship. *Compare **Thomas***, 654 So.2d at 903, *with **McGowan***, 524 So.2d at 313.

¶72. In referring to ***Thomas***, the majority states that:". . . we have previously upheld an award of loss of enjoyment of life (hedonic damages) in a wrongful death suit." In so stating, the majority once again distorts the holding of a prior decision to find precedent where none exists. In affirming Hilburn's verdict, we clearly looked to the decedent's pain and suffering during the short time that he lived after the accident, but did not a include value placed on the life that he might have enjoyed had he lived. ***Thomas***, 654 So.2d at 903.

Since **Thomas** is devoid of any discussion of any hedonic damages actually suffered by Hilburn, our brief reference to such damages should be viewed as mere dicta, with no precedential value. *See also **Motorola Communications & Electronics, Inc. v. Wilkerson***, 555 So.2d 713, 724 (Miss. 1989)(affirming damage award in wrongful death case based on evidence of elderly decedent's pain, suffering and mental anguish before death, as well as the loss of society and companionship suffered by plaintiffs).

¶73. The majority interprets Miss. Code Ann. §11-7-13 to say "that in a wrongful death case, the person bringing suit **is entitled to recover all damages of every kind and nature which might have been awarded to the decedent had he lived**. . . ." Majority Op. ¶ 47 (emphasis in Majority Op.). That, in my opinion, explains why hedonic damages are not proper to be awarded in wrongful death cases. The decedent did not live; **if he had lived, there would have been no hedonic damages because there was no "loss of life".** The law regarding the other types of damages available in wrongful death cases clearly contemplates awards to the beneficiaries for loss of future income of the decedent (adjusted by a consumption factor); loss of society an d companionship; loss of enjoyment of life for the period of time between the injury and death; pain and suffering and mental anguish before death; and medical and funeral expenses.

¶74. Since the authority cited by the majority does not support its conclusion that this Court has previously upheld an award of hedonic damages in a wrongful death case, I can only conclude that the majority's conclusion is based on a faulty premise. The most recent case in which hedonic damages have been considered by this Court was **Kansas City S. Ry.**, in which we said:

> We decide to follow other jurisdictions which have held that damages for loss of enjoyment of life compensate the injured person for the limitations placed on his or her ability to enjoy the pleasures and amenities of life. . . . Johnson has demonstrated that he is conscious of his lost enjoyment of life's pleasures, and our tort system should compensate him for these losses.

**Kansas City S. Ry.**, 798 So.2d at 380-81 (emphasis added). **Kansas City S. Ry.** was not a wrongful death case, as Mr. Johnson lived years enduring his painful and life-changing injuries. In **Kansas City S. Ry.**, we placed emphasis not only on the fact that the plaintiff had suffered injuries, but also that he was conscious of the impact his injuries would have on his future enjoyment of life. One supposes that a plaintiff in a wrongful death suit could meet such a burden if the decedent survived for some length of time and could be shown to have suffered such losses. *See **K.M. Leasing, Inc. v. Butler ex rel. Butler***, 749 So.2d 310, 321 (Miss. Ct. App. 1999)(interpreting Thomas to allow hedonic damages where decedent survived for some interval long enough to suffer hedonic damages). That burden, however, has not been met in the case sub judice, as the record reflects that Hailey did not regain consciousness before dying. As such, Hailey had no opportunity to appreciate any loss of future enjoyment of life. Pursuant to precedent, hedonic damages should not have been allowed in this case.

### B. Mississippi Federal District Court Decisions.

¶75. In **Buckhalter v. Burlington N.R.R.**, Civ. A. No. EC90-139-D-D, 1992 WL 236676, * 1 (N.D. Miss. March 23, 1992), a Mississippi federal district court, applying state law, concluded that hedonic damages were not available in wrongful death actions, relying on this Court's decisions in **McGowan** and **Shaffer** as follows:

> hedonic damages or damages for loss of the enjoyment of life are not recoverable under Mississippi's

wrongful death statute. Even though the statute states that the jury should be allowed to consider "damages of every kind to the decedent and all damages of every kind to any and all parties interested in the suit," the Mississippi Supreme Court has limited the scope of such damages to four general areas:

(1) the present net cash value of the life expectancy of the deceased, (2) the loss of the companionship and society of the decedent, (3) the pain and suffering of the decedent between the time of injury and death, and (4) punitive damages.

*McGowan v. Wright*, 524 So.2d 308, 311 (Miss. 1988)(citations omitted). The court finds that plaintiff's reliance upon Justice Robertson's concurring opinion in *Jones v. Shaffer*, 573 So.2d 740 (Miss. 1991) (Robertson, J., concurring), in which he argues that a plaintiff should be allowed to recover hedonic damages in a wrongful death action, is not the opinion of the majority of the justices on the court. *Erie*-bound to follow current Mississippi law, the court finds that all of the testimony relating to loss of enjoyment of life from Stan Smith, plaintiff's proposed expert on hedonic damages, must be excluded.

¶76. In *Moore v. The Kroger Co.*, 800 F. Supp. 429, 435 (N.D. Miss. 1992), the same federal district court discussed its decision in *Buckhalter*, and went on to say:

*McGowan* is inapplicable here because this is not a wrongful death case. Nevertheless, **concerns about double damage awards attend both types of cases.** As has been noted, a plaintiff in a personal injury action may recover for past, present and future physical pain and suffering as well as resulting mental anguish where proven by a preponderance of the evidence. Moore may also recover for the duration of the illness and the effect it will have on his "health, physical ability, age and earning power." Miss. Model Jury Instr. 20.14. In this court's opinion, these damages are highly similar to, if not synonymous with, "damages for the loss of enjoyment of life." **To allow *both* forms of damages would encourage duplicate awards and juror confusion.**

(emphasis added).

### C. Decisions in Other Jurisdictions.

¶77. Because an action for wrongful death did not exist at common law, wrongful death suits are strictly a creature of statute. Thus, in order to understand why some states have allowed hedonic damages in wrongful death actions, we must look to the state's wrongful death statute. As of this date, only four states appear to allow hedonic damages in construing their wrongful death statute, where the decedent was killed instantly: Connecticut, Hawaii, New Hampshire and New Mexico.

¶78. Connecticut's Wrongful Death Statute which permits recovery by the estate of the decedent states:

(a) In any action surviving to or brought by an executor or administrator for injuries resulting in death, whether instantaneous or otherwise, such executor or administrator may recover from the party legally at fault for such injuries, **just damages** together with the cost of reasonably necessary medical, hospital and nursing services, and including funeral expenses, . . ..

Conn. Gen. Stat. § 52-555 (emphasis added). The Connecticut Supreme Court has interpreted "just damages" to include: (1) compensation for conscious pain and suffering; (2) lost earning capacity less

deductions for necessary living expenses, discounted for present cash value; and (3) compensation for the destruction of life's enjoyment. ***Kiniry v. Danbury Hosp.***, 439 A.2d 408, 414-15 (Conn.1981).

¶79. Hawaii's Survival Statute, which also allows recovery for wrongful death by the estate of the decedent, states:

> A cause of action arising out of a wrongful act, neglect, or default, except a cause of action for defamation or malicious prosecution, **shall not be extinguished by reason of the death of the injured person. The cause of action shall survive in favor of the legal representative of the person** and any damages recovered shall form part of the estate of the deceased.

Haw. Rev. Stat. § 633-7 (emphasis added). In ***Ozaki v. Ass'n of Apartment Owners by Discovery Bay***, 954 P.2d 652, 668 (Haw. Ct. App. 1998), rev'd on other grounds, ***Ozaki v. Ass'n of Apartment Owners of Discovery Bay***, 954 P.2d 644 (Haw.1998), the Hawaii Court of Appeals concluded that hedonic damages were available in wrongful death, <u>ironically relying almost exclusively on dicta from the concurring opinion in **_Jones v. Shaffer_**</u>:

> A person tortiously injured, and permanently disabled in consequence, may recover for the diminished joy of living. . . . If this view does not hold for wrongful death cases, our law gives off unfortunate incentives. We invite the tortfeasor who runs over a pedestrian to back up and do it again and be sure his victim is dead.

***Jones v. Shaffer***, 573 So.2d 740, 746 (Miss. 1990)(Robertson, J. concurring). The logic of this argument borders on the absurd. A tortfeasor who runs over a pedestrian has been negligent and owes monetary damages. A tortfeasor who does so a second time to be sure the victim is dead has committed a felony, punishable by life in prison or death. The argument that we should allow hedonic damages in wrongful death cases so tortfeasors do not also murder needs no further response.

¶80. New Hampshire's statute also allows recovery for wrongful death by the estate of the decedent, and states in relevant part:

> If the administrator of the deceased party is plaintiff, and the death of such party was caused by the injury complained of in the action, the mental and physical pain suffered by the deceased in consequence of the injury, the reasonable expenses occasioned to the estate by the injury, **the probable duration of life but for the injury**, and the capacity to earn money during the deceased party's probable working life, may be considered as elements of damage in connection with other elements allowed by law, in the same manner as if the deceased had survived.

N.H. Rev. Stat. Ann. § 556:12 (emphasis added). As the New Hampshire Supreme Court noted in ***Marcotte v. Timberlane/Hampstead Sch. Dist.***, 733 A.2d 394, 399 (N.H. 1999), the plain language of this statute allows evidence of probable duration of decedent's life but for the injury, i.e. damages for the value of the life lost.

¶81. Finally, the New Mexico Wrongful Death Act also provides for recovery by the estate, as follows:

> Every such action as mentioned in Section 41-2-1 NMSA 1978 shall be brought by and in the name or names of the personal representative or representatives of such deceased person, and the jury in every such action may give such damages, compensatory and exemplary, as they deem **fair and just,**

**taking into consideration the pecuniary injury or injuries resulting from such death** to the surviving party or parties entitled to the judgment . . . .

N.M.S.A. § 41-2-3 (emphasis added). The New Mexico Supreme Court has interpreted this statute as follows:

> The statutory language instructs the jury to award fair and just damages, and allows the jury to consider the pecuniary injury to the decedent's statutory beneficiaries as an element of the worth of the life of the deceased. The presence or absence of pecuniary damages is a factor to be considered in arriving at a monetary figure for the value of the deceased's life. The plain language of Section 41-2-3 compels this conclusion because the phrase "taking into consideration the pecuniary injury or injuries resulting from such death to the surviving party or parties ..." is not a limiting phrase, but indicates that more than the single factor of pecuniary loss should be considered by a jury to determine fair and just compensation. The jury has long been instructed that, "In determining the monetary worth of the life of the deceased, you should consider the age, earning capacity, health, habits and life expectancy of the deceased." Just as the jury in a personal injury case must determine the monetary worth of nonpecuniary losses, so too must the jury in a wrongful death action determine fair and just compensation for the reasonably expected nonpecuniary rewards the deceased would have reaped from life as demonstrated by his or her health and habits.

*Romero v. Byers*, 872 P.2d 840, 847 (N.M. 1994).

¶82. In contrast to the statutory construction of these four states' wrongful death statute, Mississippi's statute does not provide for recovery by the estate, but instead only for the members of the decedent's nuclear family. Our statute states in pertinent part:

> to maintain an action and recover damages in respect thereof, and such deceased person shall have left a widow or children or both, or husband or father or mother, or sister, or brother, . . . The action for such damages may be brought . . . by widow for the death of her husband, or by the husband for the death of the wife, or by the parent for the death of a child, or in the name of a child, or in the name of a child for the death of a parent, or by a brother for the death of a sister, or by a sister for the death of a brother, or by a sister for the death of a sister, or a brother for the death of a brother, . . .

Miss. Code Ann. § 11-7-13 (Supp. 2001). Clearly our statute is more restrictive, only allowing siblings, parents, children and spouses to bring wrongful death actions, and not the estate of the decedent.

¶83. Further, in contrast to these four states, at least twenty other jurisdictions in construing their wrongful death statute have either expressly or impliedly rejected the application of hedonic damages, either by totally barring the application of hedonic damages to wrongful death actions, by limiting them to the period between injury and death, or else concluding that hedonic damages were a subset of pain and suffering which necessarily requires conscious awareness. These states include Arkansas, California, Delaware, Florida, Indiana, Iowa, Kansas, Maryland, Maine, Michigan, Nebraska, New Jersey, New York, North Carolina, North Dakota, Pennsylvania, Tennessee, Virginia, Washington and Wisconsin.[6]

¶84. It is further obvious that this Court views loss of enjoyment of life for the person who is injured and survives, as being separate and different from pain and suffering. *Kansas City S. Ry.*, 798 So.2d at 380-

81 *See also **Estate of Jones v. Howell***, 687 So.2d 1171, 1178 (Miss. 1996)(noting that damages in wrongful death for pain and suffering were limited to time between injury and death). The vast majority of jurisdictions which have spoken to this issue hold that the decedent must actually experience the loss of enjoyment of life, and have declined to join the extreme minority rule who hold otherwise.

## D. The English Courts' Experiment with Hedonic damages

¶85. Apparently not until 1976, did an American court allow hedonic damages in a wrongful death action applying state law. *See **Katsetos v. Nolan***, 368 A.2d 172 (Conn. 1976). However, the English courts had allowed hedonic damages nearly forty years prior to this. In an often cited law journal article, University of Arkansas at Little Rock Law Professor Andrew J. McClurg (one of the major proponents of hedonic damages) discusses the English courts' failed experiment and **subsequent abolition of hedonic damages**:

English courts have long awarded damages for what they termed the "loss of expectation of life." The first case recognizing such a recovery was ***Flint v. Lovell***, [1 K.B. 354 (1935)] where the trial court awarded 4000 to a seventy-year-old man injured in an auto accident, based upon the judge's conclusion that he had "lost the prospect of an enjoyable, vigorous and happy old age which I am satisfied on the medical testimony might have gone on for a number of years if this unhappy accident had not occurred." The evidence showed the accident reduced the plaintiff's life expectancy by eight or nine years.

In ***Rose v. Ford***, [App. Cas. 826 (1937)] the House of Lords extended the reasoning of ***Flint*** to a wrongful death situation, holding that the right to recover damages for the loss of expectation of life passes upon death to the decedent's personal representative. However, the House of Lords avoided the issue of how such damages should be measured, stating only that " how the damages are to be calculated is a question which this House has not to decide, stating only that " how the damages are to be calculated is a question which this House has not to decide, for there has been no quarrel with the amount fixed by the Court of Appeal in this case of 1,000 ."

The House of Lords grappled, quite unsatisfactorily, with the valuation issue in ***Benham v. Gambling*** [App. Cas. 157 (1941)]. The trial court awarded 1,200 for the loss of expectation of life of a two- and-one- half-year-old child, which the court of appeals affirmed. The House of Lords ruled that 1,200 was an excessive award for a child's lost expectation of life, and reduced the award to 200 . Viscount Simon's opinion for the House of Lords recognized that the Lords were faced with "the difficult task of indicating what are the main considerations to be borne in mind in assessing damages" for loss of the expectation of life. Unfortunately, the opinion did little more than eliminate certain factors from consideration, and in the end offered only an amorphous general principle as a standard. The House of Lords began by opining that the victim's life expectancy, while of some relevance, was not of primary importance in measuring damages:
[T]he thing to be valued is not the prospect of length of days, but the prospect of a predominantly happy life . . . . It would be fallacious to assume, for this purpose, that all human life is continuously an enjoyable thing, so that the shortening of it calls for compensation, to be paid to the deceased's estate, on a quantitative basis. The ups and downs of life, its pains and sorrows as well as its joys and pleasures--all that makes up "life's fitful fever"--have to be allowed for in the estimate. In assessing damages for shortening of life, therefore, such damages should not be calculated solely, or even mainly, on the basis of the length of life which is lost.

Instead, the question "resolves itself into that of fixing a reasonable figure to be paid by way of damages for the loss of a measure of prospective happiness." This requires a determination of what the victim's prospects for happiness were prior to death. The claim on behalf of the child victim in *Benham* failed on this count. Viscount Simon believed that because of her immaturity, "there was necessarily so much uncertainty about the child's future that no confident estimate of prospective happiness could be made." Based upon this, the House of Lords agreed that 200 was a proper figure for lost-expectation-of-life damages. In doing so, it emphasized that because a dead person cannot be compensated and because putting a money value on lost life necessitates an effort to "equate incommensurables," damages in all such cases should be "very moderate." Strangely, after offering this general guidance, the House of Lords acted as if it had instilled great certainty into the damage calculation process, confidently stating it was "approving a standard of measurement which, had it been applied in earlier cases, would have led . . . to reduced awards."

After *Benham*, English courts began awarding nominal, standardized sums for lost expectation of life. Thus, in *Gammell v. Wilson*, [2 All E.R. 557 (C.A.)(1980)]the court of appeals held that an award of 1,250 was proper for a decedent's lost expectation of life in all cases, to be changed only to take account of inflation. The court reasoned as follows:

This figure has to be a conventional figure. It is important that there should be uniformity. Accordingly, when the question of the amount is raised in this court, we must do our best to give guidance. It is not one of those cases where this court can properly say: "This is a matter for the trial judge. We will not interfere."

**The law has since changed in England**. In the appeal of *Gammell* [App. Cas. 27, 74 (1982)] , the **House of Lords expressed dissatisfaction with damages for the lost expectation of life and called upon Parliament to take action to clarify the amount of damages that should be awarded in wrongful death cases. In the Administration of Justice Act of 1982,** [ch. 53 § 1(1)] **Parliament responded to this call and abolished damages for lost expectation of life.** [7]

Andrew J. McClurg, *It's a Wonderful Life: The Case for Hedonic Damages in Wrongful Death Cases*, 66 Notre Dame L. Rev. 57, 106-09 (1990)(emphasis added & internal footnotes references omitted). In *Rose v. Ford*, App. Cas. at 859-62, Lord Roche, though agreeing that hedonic damages were appropriate in that case, expressed his concerns over this new element of damages in a wrongful death action:

Nevertheless, it is this question of the assessment of damages which gives me more anxiety than any other part of the case . . . I am conscious that this discussion leads into paths of abstruse thought and technicalities of law far remote from the practical directions which judges will have to give to themselves and to juries for the purposes of determining questions of amount.

. . .

I would add that I confess to some apprehension lest this element of damage may now assume a frequency and prominence in litigation far greater than is warranted in fact, and becoming common form may result in the inflation of damages in undeserving cases . . ..

### E. Hedonic Damages as a Measure of the Value of Life.

¶86. If Hailey's hedonic damages were not based on anything he actually experienced, then they must derive

from some other basis. Professor McCurley argues that an analysis of hedonic damages based solely on what the decedent experienced prior to death is too limited - - that there should be a damages award for the intrinsic worth of the life lost. *See generally* McClurg, *supra*. While I strongly agree that all life has intrinsic worth, I strongly disagree that society is served by attempting to put a dollar value on a life that was not lived, and awarding that money to a third party. That would be totally at odds with the compensatory nature of our tort system.

¶87. My final concern is the highly speculative and subjective nature of assessing damages for the life that cannot be lived. In expressing the inherent subjective nature of hedonic damages, the House of Lords wrote in ***Rose v. Ford***, "for the happy and contented no damages would be adequate; for the man on the point of suicide any damage would be excessive." ***Rose***, App. Cas. at 830. Loss of the pleasures of life can never be properly compensated by money damages. The emotional nature of the loss makes defining and quantifying damages difficult, if not impossible, and may lead to disproportionate awards. Appellate courts would be without adequate bases for meaningful review. Would defendants, under the rule proposed by the majority, be entitled to put on evidence that the decedent's life was worth very little - - because he was a habitual criminal or a drug user, a member of some disfavored social, political or religious group, or physically or mentally handicapped, or just unhappy? Or, would such evidence be excluded as prejudicial, leaving defendants no meaningful way to rebut?

¶88. In contrast, evidence of hedonic damages in personal injury cases does not present the same concerns because the injured party can usually testify as to the enjoyments of life he or she has lost as a result of the injury. The majority's ruling will require juries to make arbitrary judgments about the worth of people who can neither testify as to the quality of their lives nor be cross-examined by defendants, with no evidentiary basis for these judgments except emotional appeals designed solely to inflame the jury's passions.

¶89. I had hoped that this Court would learn from fifty years of experience of our brethren in England, and not wander down this less traveled road, as they did, before realizing that awarding hedonic damages in wrongful death actions only risks speculative, arbitrary awards and windfalls to plaintiffs. This is a pandora's box we should not open.

¶90. For all the reasons stated herein, I respectfully dissent.

**SMITH, P.J., AND WALLER, J., JOIN THIS OPINION.**

1. The jury was instructed concerning its duty to return a verdict for plaintiffs contingent upon three requisites being met.

2. Frazier testified that he was unable to see oncoming traffic due to the fog and was forced to roll down his window and listen for traffic.

3. See issue XI where we find that damages for loss of enjoyment of life are allowed in a wrongful death action.

4. "Hedonic damages. Damages that attempt to compensate the loss of the pleasure of being alive. Such damages are not allowed in most jurisdictions." Black's Law Dictionary 395 (7th ed. 1999). The concept of

hedonic damages has been known by many names, including: damages for loss of enjoyment of life, value of lost life, lost life damages, damages for the intrinsic value of life, damages for the lost expectation of life, and compensation for the destruction of life's enjoyment.

5. *See Sandifer Oil Co. v. Dew*, 220 Miss. 609, 71 So.2d 752 (1954); *Delta Chevrolet Co. v. Waid*, 211 Miss. 256, 51 So.2d 443 (1951); *Gulf Transp. Co. v. Allen*, 209 Miss. 206, 46 So.2d 436 (1950).

6. *See generally Bailey v. Rose Care Ctr., a Div. of C.A.R.E., Inc.*, 817 S.W. 2d 412, 415 (Ark. 1991)(Arkansas); *Garcia v Superior Court*, 49 Cal. Rpt. 2d 580, 581 (Cal. App. 1996)(California); *Sterner v. Wesley College, Inc.*, 747 F. Supp. 263, 273(D.Del. 1990) (citing *Winter v. Pennsylvania R.R.*, 68 A.2d 513, 514-15 (Del. Super. 1949))(Delaware); *Brown v. Seebach*, 763 F. Supp. 574, 583 (S.D. Fla. 1991)(Florida); *Southlake Limousine & Coach, Inc. v. Brock*, 578 N.E.2d 677, 680 (Ind. App. 1991)(Indiana); *Poyzer v. McGraw*, 360 N.W. 2d 748, 753 (Iowa 1985)(Iowa); *Leiker v. Gafford*, 778 P.2d 823, 838 (Kan. 1989)(Kansas), *overruled on other grounds by Martindale v. Tenny*, 829 P.2d 561, 566 (Kan. 1992); *Phillips v. Eastern Maine Med. Ctr.*, 565 A.2d 306, 309 (Me. 1989)(Maine); *Smallwood v. Bradford*, 720 A.2d 586 (Md. 1998)(Maryland); *Brereton v. U.S.*, 973 F. Supp. 752, 757 (E.D. Mich. 1997)(Michigan); *Anderson/Couvillon v. Nebraska Dep't of Soc. Servs.*, 538 N.W.2d 732, 739 (Neb. 1995)(Nebraska); *Smith v. Whitaker*, 734 A.2d 243, 246 (N.J. 1999)(New Jersey); *Nussbaum v. Gibstein*, 536 N.E.2d 618, 619 (N.Y. 1989)(New York); *Pitman v. Thorndike*, 762 F. Supp. 870, 872 (D. Nev. 1991)(citing *Wells, Inc. v. Shoemake*, 177 P.2d 451 (Nev. 1947))(Nevada); *Livingston v. U.S.*, 817 F. Supp. 601 (E.D.N.C. 1993)(North Carolina); *First Trust Co. of North Dakota v. Scheels Hardware & Sports Shop*, *Inc.*, 429 N.W.2d 5, 13 (N.D. 1988) (North Dakota); *Willinger v. Mercy Catholic Medical Center of SE Pennsylvania*, *Fitzgerald Mercy Division*, 393 A.2d 1188, 1190-91 (Pa. 1978)(Pennsylvania); *Spencer v. A-1 Crane Serv., Inc.*, 880 S.W.2d 938, 943 (Tenn. 1994)(Tennessee); *Bulala v. Boyd*, 389 S.E. 2d 670, 677 (Va. 1990)(Virginia); *Tait v. Wahl*, 987 P.2d 127, 131 (Wash. Ct. App. 1999)(Washington); *Prunty v. Schwantes*, 162 N.W. 2d 34, 38 (Wis. 1968)(Wisconsin).

7. Parliament responded by eliminating hedonic damages in all cases, except as a part of pain and suffering, and then only where there was actual awareness of the loss:

*Abolition of certain claims for damages etc.*

1. (1) In an action under the law of England and Wales or the law of Northern Ireland for damages for personal injuries-

(a) **no damages shall be recoverable in respect of any loss of expectation of life** caused to the injured person by the injuries; but

(b) if the injured person's expectation of life has been reduced by the injuries, the court, in assessing damages in respect of pain and suffering caused by the injuries, **shall take account of any suffering caused or likely to be caused to him by awareness that his expectation of life has been so reduced**.

(2) The reference in subsection (1)(a) above to damages in respect of loss of expectation of life does not include damages in respect of loss of income.

Administration of Justice Act of 1982, ch. 53, §1(1) & (2) (emphasis added).